**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

| | |
|---|---|
| Diane F. Lilja, | Case No. 16-cv-540 (TNL) |
| Plaintiff, | |
| v. | **ORDER** |
| Nancy A. Berryhill,[1] Acting Commissioner of Social Security, | |
| Defendant. | |

---

Edward C. Olson, 331 Second Avenue South, Suite 420, Minneapolis, MN 55401; and Karl E. Osterhout, Osterhout Disability Law, LLC, 521 Cedar Way, Suite 200, Oakmont, PA 15139 (for Plaintiff); and

Gregory G. Brooker, Acting United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

---

**I. INTRODUCTION**

Plaintiff Diane F. Lilja brings the present case, contesting Defendant Commissioner of Social Security's denial of her applications for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 401 *et seq.*, and supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1381 *et seq.* The parties have consented to a final judgment from the undersigned United States

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. *The Acting Commissioner of Social Security*, Soc. Sec. Admin., https://www.ssa.gov/agency/commissioner.html (last visited Feb. 1, 2017). Commissioner Berryhill is automatically substituted for the previous Acting Commissioner of Social Security Carolyn W. Colvin. Fed. R. Civ. P. 25(d) (public officer's successor is automatically substituted as party when officer ceases to hold office while action is pending).

Magistrate Judge in accordance with 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, and D. Minn. LR 72.1(c).

This matter is before the Court on the parties' cross-motions for summary judgment.  (ECF Nos. 13, 15.)  Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Plaintiff's motion for summary judgment (ECF No. 13) is **GRANTED IN PART** and **DENIED IN PART**; the Commissioner's motion for summary judgment (ECF No. 15) is **GRANTED IN PART** and **DENIED IN PART**; and this matter is **REMANDED** for further proceedings.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI in October 2012, asserting that she has been disabled since October 2011 due to fibromyalgia, herniated discs, moderate depression, allergies, sleep difficulties, pain in her neck and back, arthritis, a concussion following a motor vehicle accident, memory problems, difficulties with reading comprehension, headaches, and hearing difficulties.  (Tr. 10, 103, 105-06, 122, 124-25, 141, 143-44, 161, 163-64, 270, 271; *see* Tr. 243-55.)  Plaintiff's applications were denied initially and again upon reconsideration.  (Tr. 10, 103, 120, 122, 139, 141, 159, 161, 179, 183-89, 196-202; *see* Tr. 190-95.)  Plaintiff appealed the reconsideration determination by requesting a hearing before an administrative law judge ("ALJ").  (Tr. 10, 203-04; *see* Tr. 205-11.)  The ALJ held a hearing on September 22, 2014.  (Tr. 10, 41-101; *see* Tr. 213-32, 237-42.)  After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which denied her request for review.  (Tr. 1-6, 7-27, 36, 38.)  Plaintiff then filed the instant action, challenging the ALJ's decision.  (Compl., ECF No.

1.)  Plaintiff moved for summary judgment on July 21, 2016 (ECF No. 13), and the

Commissioner filed a cross motion for summary judgment on August 31, 2016 (ECF No.

15).  This matter is now fully briefed and ready for a determination on the submissions.

### III. RELEVANT MEDICAL HISTORY

Although Plaintiff sought benefits based on both mental and physical impairments,

the instant action relates only to Plaintiff's hearing and mental health impairments.

Accordingly, the Court focuses on the evidence in the record concerning these

impairments.

### A. 2011

Around the middle of November 2011, Plaintiff was seen in consultation by

Barbara M. Swenson, M.D., of the Noran Neurological Clinic for multiple neurological

symptoms, including neck and lower-back pain, numbness, tingling in her arms and legs,

and headaches.  (Tr. 455.)  During this visit, Dr. Swenson noted that Plaintiff has

"significant hearing loss" and has been "told she has lost 50% of her hearing."  (Tr. 455.)

Plaintiff also reported having a history of depression, but felt that Lexapro[2] was helping.

(Tr. 456.)

In relevant part, Dr. Swenson noted that Plaintiff appeared well, pleasant, and

"very cheerful."  (Tr. 456.)  Plaintiff was alert and oriented to person, place, and time.

(Tr. 457.)  Her speech and language were intact and she had "[g]ood naming and

repetition."  (Tr. 457.)  Plaintiff's comprehension was also intact.  (Tr. 457.)  While

---

[2] Lexapro is a brand name for escitalopram, which is used to treat depression and generalized anxiety disorder. *Escitalopram (By mouth) (Lexapro)*, PubMed Health, U.S. Nat'l Library of Medicine, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010165/ (last visited on Mar. 15, 2017).

Plaintiff was unable to recall any of three words after distractions, she could recall all three with cues.  (Tr. 457.)  Plaintiff made one mistake when spelling the word "world" backwards.  (Tr. 457.)

Dr. Swenson noted that she was "concerned that [Plaintiff] is having somatiform [sic] symptoms with underlying stressors that are not optimally addressed."  (Tr. 458.) Dr. Swenson recommended switching Plaintiff from "Lexapro to Cymbalta,[3] with hopes that it might help her pain as well as depression."  (Tr. 458.)   Dr. Swenson also recommended that Plaintiff be referred to a psychologist or psychiatrist.  (Tr. 458.)

During a follow-up appointment approximately three weeks later to discuss results of certain testing regarding Plaintiff's neurological symptoms, Dr. Swenson noted that Plaintiff appeared well but was anxious.  (Tr. 453.)  Dr. Swenson expressed "concern[] that [Plaintiff's] environmental factors are exacerbating her symptoms."  (Tr. 453; *accord* Tr. 447.)   Dr. Swenson again suggested switching to Cymbalta and "recommended cognitive behavioral therapy, or at least vising with psychology to address psychosocial stressors."  (Tr. 453; *see* Tr. 447.)   Dr. Swenson further recommended increasing Plaintiff's gabapentin[4] dose, but noted that Plaintiff was already experiencing side effects, so Cymbalta should be considered first.  (Tr. 453.)

Plaintiff returned to Dr. Swenson one week later for a gabapentin refill.  (Tr. 447.) Plaintiff was "mildly anxious."  (Tr. 448.)  Dr. Swenson noted that Plaintiff had tried to

---

[3] Cymbalta is a brand name for duloxetine and is used to "[t]reat depression, anxiety, diabetic peripheral neuropathy, fibromyalgia, and chronic muscle or bone pain."  *Duloxetine (By mouth) (Cymbalta)*, PubMed Health, U.S. Nat'l Library of Medicine, https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010059/ (last visited on Mar. 15, 2017).
[4] Gabapentin relieves pain "by changing the way the body senses pain."  *Gabapentin*, MedlinePlus, U.S. Nat'l Library of Medicine, https://medlineplus.gov/druginfo/meds/a694007 html  (last visited on Mar. 15, 2017).

make an appointment with her primary care provider, Todd Stolpman, M.D., but had been unable due to insurance reasons.  (Tr. 447.)  Dr. Swenson noted:

> [Plaintiff's] greatest difficulty today is having to deal with the stress of addressing her physical symptoms in addition to dealing with financial stress and application for at least short term disability.    Her friend and next-door neighbor accompanies her on her visit today and expresses concern that [Plaintiff] has been very down and anxious in dealing with her stressors, despite appearing to "keep it together" at her medical appointments.

(Tr. 447; *see* Tr. 449.)

Dr. Swenson was concerned that Plaintiff's depression and anxiety were "becoming a primary issue for [Plaintiff]," but did "not feel comfortable managing [Plaintiff's] medications for mood disorder" and "would rather defer this to [Plaintiff's] primary care [provider] or a psychiatrist."  (Tr. 449.)  Dr. Swenson recommended that a psychiatrist be consulted "to assess which management of [Plaintiff's] mood disorder will be most appropriate and even if psychological therapy would be recommended for her." (Tr. 449.)  Dr. Swenson "believe[d] the most important things for [Plaintiff] right now are to get in to see psychiatry to stabilize mood disturbance and environmental stressors as well as make an appointment with her primary care provider for follow[]up."  (Tr. 449.) Dr. Swenson emphasized to Plaintiff the importance of following up with her primary care provider and refilled Plaintiff's gabapentin prescription.  (Tr. 449.)

The following day, Plaintiff saw Dr. Stolpman, for, among other things, a "routine follow up" with respect to her depression and anxiety.  (Tr. 362.)  Dr. Stolpman noted that Plaintiff had been diagnosed with depression several years ago.  (Tr. 362.)  Plaintiff

reported feeling "a moderate degree of depression" and Dr. Stolpman noted that this episode had "been present for the past several months." (Tr. 362.) Plaintiff's symptoms included "anhedonia, anxious mood, crying spells, decreased ability to concentrate, fatigue, sadness and feelings of worthlessness." (Tr. 362.) Dr. Stolpman noted that Plaintiff was "well groomed." (Tr. 363.) Dr. Stolpman instructed Plaintiff to taper off Lexapro and start Cymbalta.

### B. 2012

Plaintiff next followed up with Dr. Stolpman towards the end of February 2012. (Tr. 364.) Plaintiff continued to experience depressive symptoms, but denied crying spells or feelings of worthlessness. (Tr. 364.) Plaintiff was again noted to be well groomed. (Tr. 365.) Dr. Stolpman increased the Cymbalta and referred Plaintiff to a psychologist. (Tr. 365-66.)

When Dr. Stolpman saw Plaintiff again in early April, her symptoms and presentation remained the same. (Tr. 367-68.). Plaintiff reported that the increased dose of Cymbalta was helping with her depression and anxiety. (Tr. 368.) There were no changes in Plaintiff's depressive symptoms or changes made to her medication during a follow-up appointment in September. (Tr. 372-74)

At a pain clinic appointment in November, Plaintiff completed the PHQ-9 questionnaire with a score of 15, "indicating symptoms of moderately severe depression." (Tr. 548.) When Plaintiff next saw Dr. Stolpman in early December, there were again no changes to Plaintiff's depressive symptoms or medication, although Plaintiff did report that her symptoms were "frequent[]and present most days." (Tr. 469; *accord* Tr. 478.)

In early December, Dr. Stolpman wrote a letter in support of Plaintiff's applications for disability. (Tr. 590.) Dr. Stolpman wrote that Plaintiff has been a patient of his for many years and has experienced "progressive problems with her health." (Tr. 590.) Dr. Stolpman noted Plaintiff's diagnoses of depression, anxiety, and "chronic fibromyalgia." (Tr. 590.) Dr. Stolpman also noted that Plaintiff was being treated at a pain clinic for back pain. (Tr. 590.) Dr. Stolpman opined:

> Unfortunately, [Plaintiff] has very limited ability to work. Her chronic pain limits her ability to focus and concentrate and perform tasks. She is limited in her ability to sit, stand, drive and walk at this time. Along with this, her fibromyalgia has added another layer to her chronic pain. [Plaintiff] is also having increased problems with hand pain, which limits her ability to perform fine motor tasks. Currently her depression and anxiety has been overwhelming because of her chronic pain and inability to work.

(Tr. 590.)

Around the middle of December, Plaintiff met with Lana Saffert, M.A., a licensed psychologist, for the first time. (Tr. 567.) At times, Saffert's handwritten notes are difficult to read. Plaintiff described trust issues, flashbacks, and physical problems, including hearing loss. (Tr. 567.) Plaintiff reported being married for 25 years before divorcing her husband and described the relationship as abusive. (Tr. 570, 571.) Plaintiff has three adult children, two sons and a daughter. (Tr. 571.) Plaintiff currently stayed at her parents' home. (tr. 571.) Plaintiff reported that her family does not understand how difficult it is for Plaintiff to live with them. (Tr. 567.) Plaintiff stated they were "good to her," but she did not feel like she belonged there and had "'no place of [her] own to call a

7

home.'" (Tr. 567.)  Plaintiff further reported that she had applied for Social Security benefits. (Tr. 567.)

Plaintiff reported a variety of symptoms, including depression, crying, irritability, and decreased energy.  (Tr. 572.)  Plaintiff also reported difficulties sleeping and concentrating, stating she could focus for ten minutes, as well as memory problems.  (Tr. 572.)  Plaintiff's health, living situation, finances, and lack of employment made her feel helpless, worthless, and guilty. (Tr. 572.)  Plaintiff also felt hopeless. (Tr. 527.)  Plaintiff reported experiencing panic attacks accompanied by shortness of breath, dizziness/faintness, palpitations/chest pain, trembling, sweating, nausea/abdominal distress, numbness/tingling, and temperature flashes.  (Tr. 573.)  Plaintiff also reported a fear of going out of control and a fear of being in certain places or situations.  (Tr. 573.)  Plaintiff's anxiety caused tension in her neck and shoulders and she engaged in vigilance/scanning.  (Tr. 573.)  Plaintiff further reported ritualistic counting and thinking that others are often mad at her.   (Tr. 573.)   Plaintiff also had difficulty with anger/temper, avoidance, dependency, impulse control, and submissiveness.  (Tr. 573.)

Plaintiff completed a questionnaire regarding the level of stress she was experiencing, support available to her, and her expectations for therapy.  (Tr. 575.)  Plaintiff rated her current level of stress as "extreme," which caused her to want to be alone and avoid talking about herself to others even when they notice something is wrong. (Tr. 575.)  Plaintiff also felt a bit lost. (Tr. 575.)  Plaintiff's stress also impacted her other health problems.  (Tr. 575.)  Plaintiff reported that her boyfriend was "100%" supportive, but felt that she received no support from anyone else, noting that her family

did not understand her health issues or why she is unable to work.  (Tr. 575.)  Plaintiff

hoped to become more confident through therapy and be able to cope better when under

stress.  (Tr. 575.)  Plaintiff reported that she found therapy to be helpful in the past.  (Tr.

575.)

Saffert noted that Plaintiff was anxious and crying.  (Tr. 567.)  Saffert diagnosed

Plaintiff with generalized anxiety disorder, adjustment disorder, panic disorder, major

depressive disorder, and posttraumatic stress disorder.  (Tr. 574.)  Plaintiff's treatment

goals included decreasing her depression and anxiety; increasing her self-esteem and self-

care; achieving a living arrangement that was as independent as possible; and improving

her relationship with her daughter, including communication and emotional support.  (Tr.

574.)  Saffert recommended treatment on a weekly basis.  (Tr. 574.)

### C. 2013

Plaintiff next saw Dr. Stolpman around the middle of January.  (Tr. 484.)  Plaintiff

continued to "feel[]a moderate degree of depression."  (Tr. 484.)  Plaintiff's current

symptoms were "anhedonia, decreased ability to concentrate and fatigue."  (Tr. 484.)

Plaintiff denied feeling anxious, sad, or worthless as well as crying spells.  (Tr. 484.)

Plaintiff was "well groomed."  (Tr. 485.)

Plaintiff had three appointments with Saffert in January.  (Tr. 562-66.)  Saffert

described Plaintiff as anxious and tearful.  (Tr. 564, 565.)  Saffert also noted Plaintiff's

"obvious hearing loss."  (Tr. 564.)  Plaintiff's mood was "pretty good—could be better if

was less depressed" and "[a]nx[ious], stressed."  (Tr. 564, 565.)  Plaintiff reported that

her typical day includes taking care of the cats, attending appointments, running errands,

using her computer for about ten minutes, washing dishes, and helping prepare meals. (Tr. 565.)  Plaintiff also reported doing laundry approximately once per week.  (Tr. 565.)

During these appointments, Plaintiff discussed personal relationships with her family, children, and boyfriend.  (*See* Tr. 562-66.)  Plaintiff discussed not being able to spend time with her daughter over Christmas and feeling like her daughter was choosing Plaintiff's ex-husband over her.  (Tr. 565.)  Plaintiff also reported isolating herself in her room while her parents had a New Year's Eve party.  (Tr. 566.)  Plaintiff reported that she "isolates a lot."  (Tr. 566.)  Although not entirely clear, it appears that one of Plaintiff's sisters may have also moved into their parents' home as well, resulting in Plaintiff moving into the basement.  (*See* Tr. 562, 564, 571.)  Plaintiff also reported that she was going to be gone for one month.  (Tr. 564.)

At the end of January, Saffert completed a medical report regarding Plaintiff.  (Tr. 475-77.)  Saffert indicated that she had seen Plaintiff three times between December 2012 and January 2013.  (Tr. 475.)  Saffert listed Plaintiff's diagnoses as generalized anxiety disorder, adjustment disorder, panic disorder, major depressive disorder, and posttraumatic stress disorder.  (Tr. 475-76.)

With respect to Plaintiff's generalized anxiety disorder, Saffert noted that Plaintiff experiences excessive worry and anxiety which she was unable to control, fatigue, difficulty concentrating, and significant distress.  (Tr. 475.)  Concerning Plaintiff's adjustment disorder, Saffert noted that Plaintiff experiences anxiety and depression regarding her divorce, the behavior of one of her sons, finances, and moving into her parents' home.  (Tr. 475.)  As for Plaintiff's panic disorder, Saffert noted that Plaintiff

experiences recurrent panic attacks with the most recent attack in early December 2012. (Tr. 476.)   Saffert additionally noted that Plaintiff has a "persistent concern" over additional panic attacks and worry.  (Tr. 476.)  In conjunction with her major depressive disorder, Saffert noted that Plaintiff has a depressed mood, "weight/appetite loss (client clearly underweight—appears frail)," and sleep disturbance.  (Tr. 476.)  Plaintiff also had decreased energy and motivation as well as low self-esteem.  (Tr. 476.)  Saffert further noted that Plaintiff was isolating, indecisive, and experiencing significant distress over finances, housing, and her "dependent status."   (Tr. 476.)   With respect to Plaintiff's posttraumatic stress disorder, Saffert noted that Plaintiff had been physically abused by a spouse for 25 years, which caused Plaintiff to have intense fear.  (Tr. 476.)  Plaintiff experienced flashbacks and nightmares as well as loss of interest and detachment.  (Tr. 476.) Further, Plaintiff was hypervigilant and had difficulty concentrating.  (Tr. 476.)

Saffert described Plaintiff as anxious, "physically frail," well groomed, and fidgety.  (Tr. 475.)  Saffert also noted that Plaintiff had an "obvious hearing impairment." (Tr. 475.)   Saffert listed the following activities when describing a typical day for Plaintiff: showering, getting dressed, making her bed, preparing some meals for herself, washing dishes, doing light laundry, watching television, socializing with some family members but avoiding her sister, napping, and spending most of her time in her room at her parents' home.  (Tr. 475.)  Plaintiff's interests were "a relationship with a friend." (Tr. 475.)  Saffert stated that Plaintiff appears to behave and have a lifestyle "consistent with [the] symptoms she endorses."  (Tr. 477.)

In response to a question regarding how Plaintiff gets along with family members and others, Saffert stated that Plaintiff was "compliant, passive [and] avoidant." (Tr. 475.)  Saffert described Plaintiff's persistence as "minimal as per chronic pain, depression, [and] anxiety" and stated that Plaintiff described her pace as "slow" due to her lack of motivation and energy as well as fatigue. (Tr. 477.)  Saffert described Plaintiff's concentration as "very limited as per client's report (and appears so in session)." (Tr. 477.)  Saffert was also asked to comment on Plaintiff's ability to respond appropriately to work pressure, supervision, and coworkers. (Tr. 477.)  Saffert responded that work pressure would be "debilitating" for Plaintiff; Plaintiff would be "easily intimidated" by supervisors; and due to Plaintiff's passivity, she would be "easily taken advantage of" by coworkers. (Tr. 477.)  Saffert opined that Plaintiff would be able to manage benefit payments. (Tr. 477.)

As for Plaintiff's prognosis, Saffert "assume[d] no recovery" for Plaintiff's impaired hearing and described Plaintiff's prognosis as "poor re[garding] recovery in other aspects." (Tr. 477.)  Saffert noted that Plaintiff's prognosis was "fair" regarding her ability to "gain[] coping skills." (Tr. 477.)

In early March, Plaintiff presented twice to the emergency room for anxiety along with itching, tingling and numbness. (Tr. 506, 509, 512.)  Plaintiff reported that when she is anxious, she itches. (Tr. 506.)  During each visit, Plaintiff appeared well and was noted to be independent in her activities of daily living. (Tr. 506, 510, 512.)

Plaintiff saw Saffert again towards the end of March. (Tr. 561.)  Plaintiff was tearful during the appointment. (Tr. 561.)  Plaintiff reported that she was again staying

with her parents.  (Tr. 561.)  Plaintiff reported that her hearing was worsening and she was scheduled to have it checked in April.  (Tr. 561.)  Plaintiff's hearing difficulties were causing anxiety and she was having particular difficulty hearing in groups.  (Tr. 561.)  Plaintiff was relieved to have the appointment scheduled.  (Tr. 561.)

During an unrelated appointment in early April, Dr. Stolpman noted that Plaintiff had an "appropriate affect and demeanor."  (Tr. 495.)  Dr. Stolpman made similar observations at a subsequently follow-up appointment approximately one month later.  (Tr. 499.)

Plaintiff had three appointments with Saffert in April.  (Tr. 559-61.)  Plaintiff most often reported that she was tired.  (Tr. 559, 561.)  During one appointment, Plaintiff attributed her tiredness to being "overworked," noting that she feels obligated to contribute around her parents' house because they basically support her."  (Tr. 561.)  At another appointment, Plaintiff attributed her tiredness to "chronic pain."  (Tr. 559.)  At times, Plaintiff also reported feeling deflated and having no energy.  (Tr. 559, 561.)  Towards the end of April, Plaintiff reported she was "[p]retty good" but worried about her daughter.  (Tr. 559.)  During these appointments, Saffert described Plaintiff's appearance and affect as "blah," "fatigued," and "anxious."  (Tr. 559.)

Jeffrey C. Manlove, M.D., evaluated Plaintiff's hearing loss also towards the end of April.  (Tr. 501, 587-88; *see* Tr. 589.)   Plaintiff reported that the hearing loss had been present for a number of years and was "slightly worsening."  (Tr. 501; *accord* Tr. 587.)  Plaintiff stated that her ears "pop" and feel like they are "full."  (Tr. 501; *accord* Tr. 587.)  In a letter to Dr. Stolpman, Dr. Manlove noted that Plaintiff's "audiometric

evaluation shows that she has significant hearing loss." (Tr. 501: *accord* Tr. 587.) Plaintiff's "[r]eported speech discrimination score [wa]s worse on the left than the right; 44% on the right, 32% on the left." (Tr. 501; *accord* Tr. 587; *see* Tr. 588.) Among other things, Dr. Manlove recommended that Plaintiff "make a hearing aid evaluation appointment." (Tr. 501; *accord* Tr. 588; *see* Tr. 499.) Plaintiff was ultimately fitted for and received hearing aids. (Tr. 576-78.)

Plaintiff met with Saffert an additional three times in May. (Tr. 557-58.) Again, Saffert's handwritten notes are quite difficult to read. (*See* Tr. 557-58.) Plaintiff continued to worry about her daughter and wanted to improve their relationship. (Tr. 558.) Plaintiff described herself as "[s]tressed" at the beginning of May, but was doing "[p]retty good" towards the end of May. (Tr. 557-58.) Saffert described Plaintiff as "[t]earful/anx[ious]," but also more assertive and with a "brighter aff[ect]." (Tr. 557-58.)

In the month of June, Plaintiff had four appointments with Saffert. (Tr. 556-57, 708-11.) During the first appointment, Plaintiff reported that she was doing "ok." (Tr. 557.) Plaintiff discussed difficulties with mental processing and tracking as well as feeling disoriented. (Tr. 557.) Plaintiff stated she had shared these symptoms with her other treatment providers. (Tr. 557.) Saffert noted that Plaintiff had difficulty tracking during the appointment and appeared distracted. (Tr. 557.) At the second appointment, Plaintiff was "[t]ired—but good."[5] (Tr. 556; *see* Tr. 708.) Plaintiff was positive about the future and Saffert noted that she had a bright affect. (Tr. 556. *But see* Tr. 708 (noting

---

[5] There appear to be two sets of progress notes for Plaintiff's June 10, 2013 appointment with Saffert. (Tr. 556, 708-09.) While the progress notes are similar, they are not identical. (*Compare* Tr. 556 *with* Tr. 708-09.)

fatigue and a depressed mood).)   Plaintiff reported that she was "now completely dependent on . . . [her] parents for housing, food, etc."  (Tr. 708-09.)

During her third appointment, Plaintiff reported increased facial pain and headaches over the past two days.  (Tr. 708.)  Plaintiff also reported increased family conflict over her dependence on her parents, stating that two of her siblings did not believe that Plaintiff deserved financial help from their parents.  (Tr. 708.)  Saffert described Plaintiff as "sad."  (Tr. 708.)  At the fourth appointment, Plaintiff was tired and frustrated with the treatment recommendations of the pain clinic.  (Tr. 710.)  Plaintiff reported, however, that she was going up north with a friend for approximately two weeks. (Tr. 710.)  Saffert noted Plaintiff was "angry."  (Tr. 710.)

At an appointment to address facial pain towards the end of June, Plaintiff reported feeling stressed out/overwhelmed, having low energy, and experiencing crying spells.  (Tr. 618.)  Plaintiff also reported having difficulty sleeping, concentrating, and relaxing.  (Tr. 618.)  Plaintiff additionally reported that she felt like taking her own life within the past six months.  (Tr. 618.)   Among other things, Plaintiff also reported depression and anxiety.  (Tr. 623.)

In July, Saffert completed a medical source statement regarding Plaintiff.  (Tr. 583.)   Saffert listed Plaintiff's diagnoses as generalized anxiety disorder, adjustment disorder, panic disorder, major depressive disorder, and posttraumatic stress disorder. (Tr. 583.)  Saffert gave Plaintiff a GAF score of 45[6] and described Plaintiff's prognosis as

---

[6] "The Global Assessment of Functioning Scale ('GAF') is used by clinicians to subjectively rate the social, occupational, and psychological functioning of adults on a scale of 0 to 100."  *Ramo v. Colvin*, No. 13-cv-1233 (JRT/JJK), 2014 WL 896729, at *4 n.11 (D. Minn. Mar. 6, 2014) (citation omitted).  "Scores of 41 through 50

"guarded." (Tr. 583.) Saffert noted that Plaintiff's "hearing loss contributes to [her] anxiety" and "chronic pain contributes to [her] anxiety [and] depression." (Tr. 583.) Saffert opined that Plaintiff had a "[m]edically[]documented history of chronic organic mental, schizophrenic, affective, or other disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do any basic work activity, with signs or symptoms currently attenuated by medication or psycho-social support" accompanied by "[a] residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate" as well as "[a] current history of 1 or more years' inability to function outside a hugely supportive living arrangement with an indication of continued need for such an arrangement." (Tr. 585.) Saffert indicated that Plaintiff's symptoms have lasted or are expected to last more than 12 months and that Plaintiff was not a malingerer. (Tr. 583.)

When asked to describe Plaintiff's "treatment and response, including any medication side effects which may affect [her] ability to work," Saffert wrote, "N/A." (Tr. 583.) Saffert similarly wrote "N/A" when asked if Plaintiff would need any unscheduled breaks during an 8-hour work day and to estimate how many days per month Plaintiff would likely be absent from work. (Tr. 585.) Saffert explained that Plaintiff "cannot maintain an 8-h[ou]r work day." (Tr. 585.)

---

indicate serious symptoms or any serious impairment in social, occupational, or school functioning." *Id.* (citation omitted). The Court notes that the most recent edition of the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. Am. Psychiatric Ass'n 2013) "discontinued use of the GAF scale." *Mabry v. Colvin*, 815 F.3d 386, 391 n.6 (8th Cir. 2016).

Saffert was also asked to evaluate Plaintiff's ability to sustain approximately 20 mental activities and maintain a productive level of functioning. (Tr. 583-84.) Saffert opined that Plaintiff had no or mild limitation in her abilities to accept instructions and respond appropriately to criticism as well as maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (Tr. 584.) Plaintiff was moderately limited in her abilities to interact appropriately with the public, ask simple questions or request assistance, and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (Tr. 584.) Plaintiff had marked limitations in her abilities to understand and remember very short and simple instructions, work in coordination with or close proximity to others without being distracted by them, and be aware of normal hazards and take appropriate precautions. (Tr. 584.) In all other areas, Saffert opined that Plaintiff was extremely limited. (Tr. 584.) Saffert further opined that Plaintiff's history of multiple head traumas over time limited her "[o]rientation/mental tracking." (Tr. 585.)

When Plaintiff returned to see Saffert in mid-July, Plaintiff was "not good" and reported experiencing back pain after minimal cleaning of her room." (Tr. 710.) Plaintiff again noted that she "wanted to contribute." (Tr. 710.) Plaintiff described her pain as exhausting and needed to take breaks. (Tr. 710.) Saffert noted that Plaintiff was "physically fatigued" and "walking slowly [and] carefully." (Tr. 710.) Plaintiff had two additional appointments in July. (Tr. 712-13.) At one point, Plaintiff reported that she was "[p]retty good," but Saffert noted that Plaintiff was tearful and sad at both

appointments.  (Tr. 712.)  Saffert's handwritten notes are again difficult to read, but it appears that Plaintiff discussed relationships in her life.  (*See* Tr. 712-13.)

Plaintiff also had an appointment with Dr. Stolpman in July.  (Tr. 626-29.) Plaintiff's mental impairments were not among her chief complaints.  (Tr. 626.)  Dr. Stolpman noted that Plaintiff was negative for psychiatric symptoms, was well groomed, and had an appropriate affect and demeanor.  (Tr. 626, 628.)

Plaintiff had another three sessions with Saffert in August.  (Tr. 714-16.)  While Plaintiff reported she was doing "[p]retty good" and spending more time with her daughter at the beginning of August, she was less positive during the next two appointments.  (*Compare* Tr. 714 *with* Tr. 714, 716.)  Plaintiff was anxious regarding her pending applications for Social Security benefits and experiencing side effects from a new pain medication, which caused her to feel tired, nauseated, abdominal distress, and muscle fatigue.  (Tr. 714, 16.)  Plaintiff again discussed how it was difficult to be dependent on others for necessities and brought up financial issues with respect to her car. (Tr. 714.)  Saffert described Plaintiff as anxious, depressed, and occasionally tearful during these appointments.  (Tr. 714-16.)

In early September, Plaintiff told Saffert that she had been denied Social Security disability benefits and was afraid to tell her family.  (Tr. 717.)  Plaintiff was concerned over what the reaction might be.  (Tr. 717.)  Plaintiff told Saffert that she would work if she was able to, but she cannot.  (Tr. 717.)  Saffert noted that Plaintiff was tearful, depressed, and anxious.  (Tr. 717.)  About one week later, Plaintiff's outlook was better. (Tr. 717.)  Plaintiff had spoken with her caseworker and was going to seek

reconsideration of the disability determination. (Tr. 717.) Plaintiff still, however, harbored feelings of anxiety, frustration, and sadness over the decision. (Tr. 718.) Plaintiff described her life as being "in limbo" while she waited. (Tr. 718.) During her next appointment about one week later, Plaintiff discussed competing relationships in her life. (Tr. 719.) Saffert described Plaintiff as struggling with her emotions. (Tr. 719.)

Plaintiff saw both Dr. Stolpman and Saffert in October. When she saw Dr. Stolpman in early October, Plaintiff's mental impairments were not among her chief complaints and Dr. Stolpman noted that Plaintiff was negative for psychiatric symptoms, was well groomed, and had an appropriate affect and demeanor. (Tr. 633, 635.) Around the middle of October, Plaintiff met with Saffert. (Tr. 719.) Plaintiff reported that she had spent some time in International Falls, Minnesota, and now had a clearer idea of where a relationship with a friend was going. (Tr. 719.) Plaintiff also reported that she was worried over her mother's illness. (Tr. 719.) Saffert noted that Plaintiff had a "brighter affect." (Tr. 719.)

Plaintiff had two additional appointments with Saffert in October. (Tr. 720-21.) Plaintiff reported that she was "[a]lright" and discussed results of medical testing. (Tr. 720.) Saffert noted that Plaintiff gets stressed when discussing money and this was a trigger for Plaintiff's flashbacks. (Tr. 720.) Saffert described Plaintiff as "anxious." (Tr. 720.) During her appointment at the end of October, Plaintiff was feeling "tired" and "drained." (Tr. 720.) The cold weather was causing an increase in her pain and she had a persistent headache the day before. (Tr. 720.) Plaintiff and Saffert discussed some of Plaintiff's functional abilities. Plaintiff stated that she had problems lifting and could lift

about two pounds comfortably.  (Tr. 720.)  Plaintiff reported that a "leaning position" is the most difficult for her and one and one-half hours was the tolerable limit for standing. (Tr. 720, 721.)  Plaintiff also stated she is unable to kneel because her knees are damaged. (Tr. 721.)  According to Plaintiff, she "would not be able to live on [her] own."  (Tr. 721.)  Plaintiff reiterated that finances cause emotional flashbacks for her.  (Tr. 721.) Saffert described Plaintiff as "fatigued."  (Tr. 720.)

Plaintiff also had a follow-up appointment regarding her hearing aids at the end of October.  (Tr. 603.)  Plaintiff reported that "things are going well with the hearing aids." (Tr. 603.)  A few adjustments were made.  (Tr. 603.)

Plaintiff saw Dr. Stolpman in early November for, among other things, a routine check of her depression.  (Tr. 643.)  Plaintiff described her depression as "moderate" and Dr. Stolpman noted that "[t]his episode of depression has been present for the past several years."  (Tr. 643.)  Plaintiff's current symptoms were anhedonia, decreased concentration, and fatigue.  (Tr. 643.)  Plaintiff denied feeling anxious, sad, or worthless as well as crying spells.  (Tr. 643.)  Plaintiff reported that Cymbalta was helpful.  (Tr. 643.)  Plaintiff was well groomed and had an appropriate affect and demeanor.  (Tr. 644-45.)  Dr. Stolpman refilled Plaintiff's Cymbalta prescriptions.  (Tr. 645.)

Plaintiff met with Saffert five times during the month of November.  (Tr. 722-26.) During these appointments, Plaintiff continued to talk about troubled family dynamics, her mother's illness, and her own health problems.  (Tr. 722-26.)  Certain members of Plaintiff's family accused her of "scamming" regarding "not be[ing] able to work."  (Tr. 725.)  Plaintiff reported feeling "[n]ot real good," "[p]retty good," and "O.K."  (Tr. 722,

724, 725.)   Saffert described Plaintiff as "angry/hurt," "concerned," "depressed," "defeated," and "sad."   (Tr. 722, 725.)   On occasion, Plaintiff cried.   (Tr. 722, 725.) During one appointment, however, Plaintiff stated that she and her daughter were getting along well and, at this appointment, Saffert described Plaintiff as having a "brighter affect."   (Tr. 724.)

During follow-up appointment to address facial pain in early December, Plaintiff reported having depression and anxiety.   (Tr. 611; *see* Tr. 607.)   Plaintiff described her stress level as high.   (Tr. 612; *see* Tr. 607.)   During an appointment with Dr. Stolpman the same month, however, Dr. Stolpman noted that Plaintiff was negative for psychiatric symptoms, was well groomed, and had an appropriate affect and demeanor.   (Tr. 646, 648.)   Plaintiff also had two appointments with Saffert in the month of December. Despite reporting that there was "lots of stuff going on [at] home," Plaintiff was "[p]retty good" and Saffert noted she had a "brighter affect."   (Tr. 727.)   Similarly, while Plaintiff was "[t]ired," she felt good about recent communications with her daughter and one son and Saffert noted that, while Plaintiff "appear[ed] fatigued," she was "smiling."   (Tr. 727.)

**D.  2014**

When Plaintiff saw Saffert in early January 2014, she reported that her daughter had spent Christmas with Plaintiff and her family, which was "very good."   (Tr. 728.) Saffert noted that Plaintiff had a "flat" affect and "appear[ed] tired."   (Tr. 728.)

Plaintiff saw Dr. Stolpman once and Saffert three times in the month of February. (Tr. 652, 728-31.)   Dr. Stolpman noted that Plaintiff was negative for psychiatric

symptoms, well groomed, and had an appropriate affect and demeanor.  (Tr. 652, 654.)

With Saffert, Plaintiff reported continued struggles with pain, physical health problems,

and finances.    (Tr. 728, 729-30, 731.)    Plaintiff reported feeling very frustrated,

worsening depression, and isolating herself in her room.  (Tr. 729, 731.)  Saffert most

often described Plaintiff as being depressed and having a flat affect, (Tr. 428, 729, 731),

but also noted at times that Plaintiff was fatigued, tearful, and irritable, (Tr. 728, 729,

731).

Plaintiff was largely the same during her four appointments with Saffert in March.

(*See* Tr. 732-34.)  Plaintiff reported feeling depressed about how dependent she was.  (Tr.

732.)  Plaintiff was frustrated regarding her physical limitations and wanted to be more

active. (Tr. 733l.)  Plaintiff was, however, able to reconnect with one of her sons.  (Tr.

734.)   During these appointments, Saffert noted that Plaintiff was "sad," "tearful,"

"tired," "concerned," (Tr. 732, 734), but Plaintiff had a "brighter affect" during the

appointment towards the end of March, (Tr. 734).

Plaintiff had one appointment with Dr. Stolpman and four appointments with

Saffert in April.   (Tr. 668, 735-37.)    Again, Dr. Stolpman noted that Plaintiff was

negative for psychiatric symptoms, was well groomed, and had an appropriate affect and

demeanor.  (Tr. 668, 670.)   During her appointments with Saffert, Plaintiff appeared

about the same or slightly improved.  While Plaintiff was tired, she had been going for

longer walks, which helped relieve stress.  (Tr. 735.)  Plaintiff did report some racing

thoughts around bedtime and found it difficult "to 'shut off' [her] mind."  (Tr. 735.)

Plaintiff also continued to have concerns over her physical health.  (Tr. 736-37.)  During

the first two appointments, Saffert described Plaintiff as "engaged" and having a "brighter affect." (Tr. 735.) During the two appointments towards the end of April, Plaintiff was "anxious," "restless," and "walking hunched over." (Tr. 736.)

In May, Plaintiff met with Saffert twice, reporting that she was either "good" or "[p]retty good." (Tr. 738.) Plaintiff continued to undergo various tests in connection with her physical health. (Tr. 738-39.) Saffert described Plaintiff as "brighter," "engaged," and "thoughtful." (Tr. 738.) Saffert also decreased the frequency of Plaintiff's appointments, from approximately every week to every other week. (Tr. 738.) Later in May, Plaintiff was seen for unrelated concerns, and the examining physician noted that Plaintiff was "well developed," "well nourished," "well groomed," and in "no apparent distress." (Tr. 673.) Plaintiff also had an "appropriate affect and demeanor" as well as a "normal speech pattern." (Tr. 674.)

Plaintiff saw Saffert twice in June, both times reporting that she was "[p]retty good." (Tr. 740.) Plaintiff was experiencing some increased pain. (Tr. 740-41.) Plaintiff also discussed relationships with others in her life. (Tr. 740-41.) Plaintiff had a flat affect each time and Saffert noted that Plaintiff "appear[ed] tired." (Tr. 740.)

When Plaintiff saw Dr. Stolpman in early July, he again noted that she was negative for psychiatric symptoms, was well groomed, and had an appropriate affect and demeanor. (Tr. 686, 688.) Plaintiff also had two appointments with Saffert towards the middle and end of July. (Tr. 742-45.) During the first appointment, Plaintiff reported that she was "[p]retty good as long as [she] take[s] [a] muscle relaxer daily." (Tr. 742.) At the second appointment, Plaintiff was "OK." (Tr. 744.) The discussions at these

appointments focused primarily on Plaintiff's physical health and increased swelling Plaintiff was experiencing.  (Tr. 742-44.)  Saffert observed the swelling as well.  (Tr. 742, 744.)  Plaintiff also reported that she had not driven her own car for approximately four months because she was unable to afford insurance or gas.  (Tr. 744-45.)  Plaintiff was "tearful" and felt "deflated."  (Tr. 744.)

During a physical therapy appointment towards the end of July, Plaintiff reported that she had difficulty relaxing.  (Tr. 750.)  The physical therapist noted that Plaintiff had difficulty following instructions and letting go.  (Tr. 750.)   The physical therapist similarly noted that Plaintiff had "much difficulty [with] relaxation."  (Tr. 750.)  Plaintiff also saw Dr. Stolpman around the end of July.  (Tr. 764.)  He noted that Plaintiff was negative for psychiatric symptoms, was well groomed, and had an appropriate affect and demeanor.  (Tr. 764, 766.)

At an appointment in early August to address "bilateral hand numbness and tingling," Plaintiff was noted to be alert and oriented with a normal mood and affect.  (Tr. 758, 60.)  Plaintiff also met with Saffert around this time.  (Tr. 752.)  This discussion was largely focused on Plaintiff's hand pain.  (Tr. 752-53.)   Plaintiff also discussed panic attacks she experienced in the past following a car accident.  (Tr. 753.)  Saffert noted that Plaintiff was "irritable" and "appear[ed to be] in pain."  (Tr. 752.)

When Plaintiff saw Dr. Stolpman again around mid-September, he similarly noted that she was negative for psychiatric symptoms, well groomed, and had an appropriate affect and demeanor.  (Tr. 768, 770.)  In addition to seeing Dr. Stolpman, Plaintiff also had three appoints with Saffert.  (Tr. 754-57.)  Plaintiff talked about concerns with her

daughter's living situation, tensions at home with her family, increased pain in her back, and the upcoming Social Security hearing.  (Tr. 754-57.)  At the appointment at the end of September, Plaintiff discussed the hearing.  (Tr. 756.)  Plaintiff described it as a "tough situation" and stated it was hard for her to hear at times.  (Tr. 756.)  Plaintiff felt that the ALJ "listened" and was "nice to [her]."  (Tr. 756.)  Plaintiff also discussed being aware of how her thinking process is affected by her depression, anxiety, and medication.  (Tr. 757.)

## IV. DISABILTY REPORTS & DETERMINATIONS

### A.  Prior to Initial Determination

Plaintiff participated in an interview in connection with her disability applications in November 2012.  (Tr. 266-68.)  The interviewer did not perceive any difficulties during the interview, including hearing.  (Tr. 267.)

In December 2012, Plaintiff completed a function report.  (Tr. 279-86.)  Much of the function report relates to Plaintiff's physical impairments which are not at issue in this case.  At the time, Plaintiff was living in an apartment with her boyfriend.  (Tr. 279.) Plaintiff reported that hearing aids were recommended by a doctor, but she was unable to afford them.  (Tr. 285.)

Plaintiff described her daily activities as tending to her own personal care, drying dishes, using her computer "for a bit," letting the dog outside, going out for coffee, helping with dinner, drying dishes, walking a little bit, and picking her daughter up from school and taking her to work.  (Tr. 280, 281, 282; *see* Tr. 283.)  Plaintiff also helped take care of cats.  (Tr. 280.)  Plaintiff also occasionally watched television.  (Tr. 280.)

Plaintiff also occasionally went shopping with others.  (Tr. 280.)  Plaintiff was able to go by herself for "small lightweight items."  (Tr. 282.)  Plaintiff shopped online only when necessary.  (Tr. 282.)  Plaintiff reported that she sometimes has difficulty counting change and needs assistance.  (Tr. 283.)  Plaintiff prepared simple meals, "usually frozen foods, like chicken[ or] fish," twice per week and performed light household chores approximately once per week.  (Tr. 281.)

Plaintiff listed "going for coffee" as her hobby.  (Tr. 283.)  Plaintiff stated sometimes she stays at the coffee shop, "but mostly get[s her coffee] to go and sit[s] in the car alone."  (Tr. 283.)  Plaintiff reported that she used to watch more television, but now she cannot hear it most of the time.  (Tr. 283.)  Plaintiff reported that she needed to be reminded to go places approximately "once every few weeks."  (Tr. 283.)  Plaintiff also reported that she needed someone to accompany her.  (Tr. 283.)  When asked if she had problems getting along with others, Plaintiff answered "no" except for when others are mean to hear or say things that are not true.  (Tr. 284.)  With regards to changes in her social activities since her impairments began, Plaintiff reported that she keeps to herself more and does not "go out much" except for coffee.  (Tr. 284.)  Plaintiff stated that she does not "do half of what [she] use[d] to" do and no longer goes shopping for fun or hangs out with friends.  (Tr. 284.)

When asked how her impairments limit her ability to work, Plaintiff reported, in relevant part, that, when she is "in pain from any activity," she "can[not] think properly." (Tr. 279.)  Plaintiff also reported that it was difficult for her to think and remember things.  (Tr. 279.)  Plaintiff reported that her impairments affect her hearing, memory,

completion of tasks, and concentration as well as her abilities to understand and follow instructions. (Tr. 284.) Plaintiff wrote a question mark next to "[g]etting along with others." (Tr. 284.) With regards to her memory, Plaintiff reported that she needs to write notes and can easily get confused. (Tr. 284.) Plaintiff further reported that she has "a lot of problems understanding things" and is "not good at instructions." (Tr. 284.) As for written instructions, Plaintiff stated that she needed "to reread things over [and] over"; "sometimes (a lot) [she] do[es no]t understand"; and "if [it is] to[o] hard," she does not "do it at all." (Tr. 284.) Plaintiff reported doing "a little bit better" with spoken instructions, but will forget if she is interrupted or is given "more than one thing to do." (Tr. 284.)

Plaintiff reported different things with regards to her ability to concentrate and complete tasks. In one portion of the form, Plaintiff stated she was not able to complete tasks and could only concentrate for ten minutes. (Tr. 284.) In another section, Plaintiff stated that she could pay attention for 15 minutes and was able to finish what she starts. (Tr. 284.) Plaintiff reported that she does not handle changes in routine well and did not answer the question regarding her ability to handle stress. (Tr. 285.)

## B. Initial Determination

As noted above, Plaintiff's disability applications were denied initially. During the initial determination, Karen Terry, Ph.D., assessed Plaintiff's mental residual functional capacity. (Tr. 117-18, 136-37.) Terry opined that Plaintiff had no understanding or memory limitations, but did have concentration and persistence, social interaction, and adaption limitations. (Tr. 117-18, 136-37.)

With respect to Plaintiff's limitations in sustained concentration and persistence, Terry opined that there was no evidence of limitation regarding Plaintiff's ability to carry out very short, simple instructions or make simple, work-related decisions.  (Tr. 117, 136.)  Plaintiff was not significantly limited in her abilities to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; and work in coordination with or in proximity to others without being distracted by them.  (Tr. 117, 136.)  Terry opined that Plaintiff was moderately limited in her abilities to carry out detailed instructions, maintain attention and concentration for extended periods of time, and complete "a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods."  (Tr. 117; *accord* Tr. 136.)  Terry explained that Plaintiff's psychological symptoms and pain "impact this domain."  (Tr. 117; *accord* Tr. 136.)  Terry concluded that Plaintiff retains the ability "to perform simple, routine 1-2 step tasks that do not have fast-paced performance or strict production quota requirements."  (Tr. 117; *accord* Tr. 136.)  Terry also noted that Plaintiff "reports performing better with spoken instructions versus written ones."  (Tr. 117; *accord* Tr. 136.)

Turning to Plaintiff's limitations in social interaction, Terry opined that there was no evidence of limitation regarding Plaintiff's abilities to interact appropriately with the public, accept instructions and respond appropriately to criticism from supervisors, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.  (Tr. 117-18, 136-37.)  Terry opined that Plaintiff was not significantly

limited in her ability to ask simple questions or request assistance.  (Tr. 118, 137.)  Terry was unable to determine whether there was any limitation on Plaintiff's ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes based on the available evidence.  (Tr. 118, 137.)  In reaching these conclusions, Terry relied on comments describing Plaintiff as "compliant, passive and avoidant" and Plaintiff's own reports that, while she keeps to herself more, she spends some time socializing with family (except for her sister) and does not have problems getting along with others unless they say something mean about her.  (Tr. 118; *accord* Tr. 137.)

In the category of adaption limitations, Terry opined that Plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting, but otherwise there was no evidence of limitation in this category.  (Tr. 118, 137.)  Terry explained that Plaintiff "retains the ability to perform job duties that remain static; any necessary changes need to occur infrequently and be adequately and easily explained to her."  (Tr. 118; *accord* Tr. 137.)

### C. Following the Initial Determination

Plaintiff completed another disability Report in April 2013.   (Tr. 297-303.) Plaintiff reported that her condition had worsened since her last disability report.  (Tr. 297.)  Among other things, Plaintiff reported an increase in anxiety and pain and felt fatigued every day.  (Tr. 297.)  Plaintiff also had been experiencing "dizzy spells all the time" and "ha[d] passed out due to these spells."  (Tr. 297.)  Plaintiff reported that she has difficulties sleeping due to pain and anxiety, "which makes her tired during the day

and limits her daily activities." (Tr. 294.) Plaintiff also reported that "she is not functioning or thinking well." (Tr. 297.)

In addition, Plaintiff reported changes in her ability to care for her own personal needs. (Tr. 302.) Plaintiff stated that she "is unable to lift her arms up over her head due to pain, and she needs assistance with getting dressed and bathing." (Tr. 302.) Plaintiff also reported "lack[ing] the energy to bathe on a regular basis." (Tr. 302.) Additionally, Plaintiff's "back hurts when bending over and sometimes she needs assistance with putting on her socks and shoes." (Tr. 302.) Similarly, Plaintiff reported changes in her daily activities. (Tr. 302.) Plaintiff stated that she "no longer goes out alone." (Tr. 302.) Plaintiff explained that she does not feel safe going out alone because of her dizziness and fainting spells. (Tr. 302.) Plaintiff also "feels unbalanced when walking" and "has pain in her legs and feet." (Tr. 302.) Plaintiff further reported that, "due to her anxiety and physical problems, she feels weak and sick every day" and "does not leave her home unless she has appointments and/or goes shopping for supplies." (Tr. 302.)

### D. Reconsideration Determination

On reconsideration, it was noted that Plaintiff had an audiometric evaluation in April 2013 that "show[ed] that she has significant hearing loss." (Tr. 151; *accord* Tr. 171.) Plaintiff's "reported speech discrimination score [wa]s worse on the left than on the right; 44% on the right 32% on the left." (Tr. 151; *accord* Tr. 171.) When assessing Plaintiff's physical residual functional capacity, Charles T. Grant, M.D., concluded that Plaintiff had both communication and environmental limitations on account of her hearing loss. (Tr. 154, 174.) Dr. Grant determined that Plaintiff was limited in her

ability to hear and that her word recognition scores were "close to listing severity." (Tr. 154; *accord* Tr. 174.) Dr. Grant therefore amended the previous physical residual-functional-capacity assessment "to address hearing loss." (Tr. 154; *accord* Tr. 174.) Dr. Grant opined that Plaintiff should have "[n]o telephone work" and "[a]void noisy work environments." (Tr. 154; *accord* Tr. 174.) Dr. Grant also opined that Plaintiff should "[a]void even moderate exposure" to noise. (Tr. 155; *accord* Tr. 175.)

James M. Alsdurf, Ph.D., a licensed psychologist, evaluated Plaintiff's mental residual functional capacity. (Tr. 155-57, 175-77.) Alsdurf reached the same conclusions as Terry. (*Compare* Tr. 155-57, 175-77 *with* Tr. 117-18, 136-37.)

### E. Following Reconsideration Determination

Plaintiff completed a third disability report in September 2013. (Tr. 305-11.) Plaintiff again reported that her condition had gotten worse, citing increased pain in various parts of her body. (Tr. 305.) Plaintiff reported that "the pain wipes [her] out and [she] ha[s] no more energy." (Tr. 305.) Plaintiff also reported interruptions in her sleep due to pain. (Tr. 305.) Plaintiff further reported that she has trouble standing, so, while she is able to take care of her personal needs, she "need[s] to take several breaks" and does not "do much with [her] hair anymore as [her] arms go numb when held up." (Tr. 309.) Plaintiff additionally reported that her pain "causes [her] trouble driving." (Tr. 309.) Plaintiff reported that she "ha[s] pain in the back that causes [her] muscle to go numb, and then a severe headache will come on during this time and keep [her] from doing anything." (Tr. 309.)

## V. ALJ PROCEEDINGS

### A. Hearing Testimony

At the beginning of the hearing, while the ALJ was administering the oath, it appears that Plaintiff was not able to hear the ALJ's instruction to raise her right hand. (Tr. 45.)  The ALJ asked Plaintiff whether she had trouble hearing and Plaintiff testified that she "ha[s] a lot of trouble hearing, even though [she] wear[s] hearing aids."  (Tr. 45.) The ALJ instructed Plaintiff to raise her hand if she was unable to hear a question, and the question would be repeated.  (Tr. 45.)  Much of the hearing testimony focused on Plaintiff's physical conditions, including pain.  (Tr. 50-62, 67-69, 70-71, 72, 76-80, 85-86.)

Plaintiff testified that she currently lives with her parents.  (Tr. 62.)  Plaintiff stated that, while her daughter does not live with her, she drives her daughter to work approximately three times per week.  (Tr. 63.)  Plaintiff testified that she is "really stiff" after the approximately 20-minute drive.  (Tr. 68-69.)  Plaintiff testified that she checks e-mails and Facebook on her computer for a total of 10 to 15 minutes a couple of times per day, but otherwise is "computer illiterate."  (Tr. 66, 85.)  As for helping around the house, Plaintiff testified that she and her father do dishes together with Plaintiff drying and she cleans the litter boxes of her two cats, takes care of her bird, vacuums her room, and does her own laundry.  (Tr. 81-82.)  Plaintiff testified that she does not do much cooking and usually goes to the grocery store with her father.  (Tr. 83.)

Plaintiff testified that she has "very poor hearing."  (Tr. 48.)  Plaintiff testified that she has had her hearing aids adjusted "several times" and they are as loud as they can be.

(Tr. 49.)  Plaintiff stated that the hearing aids are so loud that she often experiences feedback.  (Tr. 49.)  Plaintiff testified it is difficult for her to "make out words and letters" on the telephone, so she usually has someone else call for her.  (Tr. 48-49; *see* Tr. 90-91.)  Plaintiff also testified that her family gets very frustrated at times with her hearing loss.  (Tr. 50.)  At one point during the hearing, Plaintiff's representative talked with Plaintiff about lip reading, noting she had seen Plaintiff "studying [her] lips."  (Tr. 89.)  Plaintiff testified that she relies on lip reading all of the time because when she is able to look at someone's lips, she knows what letters and numbers are being said and what the person is talking about.  (Tr. 89.)  If Plaintiff is not able to look directly at the person talking, it is very difficult for her.  (Tr. 89-90.)

Plaintiff testified that she first began experiencing symptoms of posttraumatic stress disorder a few years ago.  (Tr. 87.)  Plaintiff testified that she would have nightmares regarding her ex-husband or would "have to deal with him before [her daughter] turned 18."  (Tr. 87.)  Plaintiff testified that she would get very upset and stressed to the point that she would "lose [her] thoughts."  (Tr. 87.)  Plaintiff testified that she continues to experience flashbacks, including recently when she saw someone who looked like her ex-husband and got very upset, tense, and scared.  (Tr. 87; *see* Tr. 94-95.)  With respect to her anxiety disorder, Plaintiff testified that her anxiety is so great that sometimes she passes out.  (Tr. 88.)  Plaintiff's anxiety makes her "very tense" and increases her pain.  (Tr. 88; *see* Tr. 69.)  Plaintiff testified that while she has not been hospitalized overnight for anxiety or depression, she did go to the hospital once in connection with thoughts of suicide during her marriage.  (Tr. 80.)

Plaintiff also testified that her physical health impacts her mental health, including an increase in pain with increased stress.  (Tr. 89; *see* Tr. 69.)  Plaintiff testified that the tension in some of her family relationships causes stress for her.  (Tr. 78; *see* Tr. 93-94.) Plaintiff testified that her "memory is not the greatest."  (Tr. 67.)  Plaintiff testified that she has had some mental problems following a car accident, stating that she "get[s] severely confused at times."  (Tr. 73.)  Plaintiff testified that when she gets confused, she is not able to think.  (Tr. 73.)  As an example, Plaintiff described a day when she got confused while driving in an area that was familiar to her.  (Tr. 73.)

The ALJ also asked Plaintiff about a trip she had taken up north.  (Tr. 71.) Plaintiff testified that the trip was "[v]ery difficult" and she had "to get out several times" while traveling.  (Tr. 71.)  Once she arrived, however, it was more relaxing, but there were still tense situations and she still had pain.  (Tr. 72.)

The ALJ then posed a series of questions to a vocational expert.  (Tr. 96-97.)  The ALJ first posed a hypothetical individual of the same age, education, and experience as Plaintiff as well as the same impairments with the following additional limitations:

> One evaluator limited her to, at best, a light range of work, but limited her from working in a noisy environment.  And I might define that as being where she would be in excess of say, approximately, 80 decibels.  Or if she were to have a noisy environment, to be allowed to wear . . . hearing protection.  And for non-exertional limitations, limited to essentially a simple; routine; one . . . to two step task [sic] without any fast pace and that is she shouldn't be on an assembly line where she has to keep up with the pace set by someone else; that is no strict production quotas like an assembly [line]; that she should have tasks . . . or changes that are infrequent; and that are easy to explain.

(Tr. 97-98.)  The vocational expert testified that such an individual would not be able to do Plaintiff's past relevant work as a school custodian or cashier, but such a person would be capable of performing work as a small-products assembler, collator operator, and electronics worker.  (Tr. 98-99.)

The ALJ then asked the vocational expert about a hypothetical person with the limitations identified by Saffert, Plaintiff's psychologist.  (Tr. 99.)  The ALJ noted that Saffert had rated Plaintiff's limitations as extreme, marked, moderate, or none, and that most of them were rated as extreme.  (Tr. 99.)  The ALJ asked:

> Rated as extreme, of course, are most of them, including, remembering work[-]like procedures; understanding detailed instructions; and carrying them out; maintaining attention and concentration for two hours; performing activities within the schedule; sustaining an ordinary routine; making simple work related decisions; completing a normal work day without psych interruptions; responding to changes in work setting; traveling in unfamiliar places; ability to set realistic goals; and tolerating normal levels of stress.  Now I could go on. But with those limitations in your opinion, could a person do those three jobs [previously identified by the vocational expert] or other jobs . . . ?

(Tr. 99.)  The vocational expert testified that such limitations would render a person incapable of competitive work.  (Tr. 99.)  The vocational expert subsequently confirmed that his testimony was consistent with the Dictionary of Occupational Titles ("DOT"). (Tr. 99-100.)

The vocational expert additionally testified that if a person needed to miss more than two days of work per month, such a person would not be able to maintain competitive employment.  (Tr. 100.)  Similarly, the vocational expert testified that a

person would not be capable of competitive employment if they were unable to work for a full eight hours, such as leaving early or arriving late.  (Tr. 100.)

## B.  ALJ Decision

The ALJ found and concluded that Plaintiff had the severe impairments of, among other things, major depressive disorder, anxiety, and hearing loss and none of Plaintiff's impairments when considered individually or in combination met or equaled listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 12-15.)  The ALJ did not expressly consider whether Plaintiff's hearing loss met or equaled a listed impairment. (*See* Tr. 13-15.)

The ALJ found that Plaintiff has the residual functional capacity perform light work with the following additional limitations:

> no work in a noisy environment (excess of 80 decibels) if in a noisy environment, allowed to wear hearing protection[;] performing simple, routine 1-2 step tasks[;] in a work environment that is not fast paced such as an assembly line where a pace is set by someone else or there is a strict production quota[; and] with infrequent work place changes that can be easily explained.

(Tr. 15.)

In assessing Plaintiff's residual functional capacity, the ALJ gave no weight to Saffert's opinions.  (Tr. 18-19.)  With respect to Saffert's January 2013 opinion, the ALJ noted that "[a]fter only three visits, [Plaintiff's] provider . . . opined mental limitations in excess of the record."  (Tr. 18.)  The ALJ found that this opinion was inconsistent with treatment notes in which Plaintiff reported that she was doing "pretty good," "ok," "tired but good," and "pretty good-could be better."  (Tr. 18-19.)  The ALJ also found that

Saffert's opinion was inconsistent with other evidence in the record, including Dr. Stolpman's treatment notes. (Tr. 19.)

The ALJ similarly rejected Saffert's July 2013 opinion that Plaintiff had a GAF score of 45 with "marked to extreme limitations in almost all areas of mental functioning with mild to moderate limits in performing social activities." (Tr. 19.) The ALJ reasoned that, "as just discussed, treatment notes from [Saffert] indicated on many occasions that [Plaintiff] was doing okay, good and pretty good." (Tr. 19.) The ALJ then pointed to other evidence in the record that was inconsistent with the extreme limitations identified by Saffert. (Tr. 19.) The ALJ noted that Dr. Swenson of the Noran Neurological Clinic observed that Plaintiff was "just mildly anxious when seen . . . in December 2011" and Plaintiff's comprehension, speech, and language were all in intact. (Tr. 19.) The ALJ also noted that Plaintiff "described moderate depression" to Dr. Stolpman in September 2012, and denied "crying spells, feeling worthless and suicidal ideations." (Tr. 19.) The ALJ additionally pointed out that Dr. Stolpman observed that Plaintiff was "well groomed with an appropriate affect and demeanor" and that Plaintiff "had normal psychomotor function and speech along with thought and perception." (Tr. 19.) Noting that Plaintiff was taking Cymbalta, the ALJ also pointed out that Plaintiff denied having an anxious mood when she saw Dr. Stolpman in November 2013. (Tr. 19.) Based on the foregoing, the ALJ gave Saffert's opinion "no weight due to the lack of support in the record." (Tr. 19.)

The ALJ also gave no weight to Dr. Stolpman's December 2012 opinion that Plaintiff "has a 'very limited ability to work'" and "[h]er depression and anxiety have

been overwhelming" because it was "contradicted by the evidence" in the record.  (Tr. 18.)  The ALJ cited places in the record where Plaintiff's mood and affect were noted to be normal and Plaintiff had a "PHQ-9 score of 15."  (Tr. 18.)  The ALJ also pointed to Dr. Stolpman's own notes that Plaintiff appeared well groomed and displayed an appropriate affect and demeanor.  (Tr. 18.)

The ALJ gave "great weight" to the opinions of the state agency psychological consultants.  (Tr. 19.)  The ALJ reasoned:

> Although the [s]tate [a]gency psychological consultants did not examine [Plaintiff], the consultants reviewed the evidence of record and utilized specialized knowledge in assessing mental impairments and resulting limitations within the SSA standard of disability.  As these opinions are consistent with and supported by the overall evidence as addressed above including the course of treatment, mental status observations and [Plaintiff's] daily activities, the mental limitations assessed were incorporated into the residual functional capacity.

(Tr. 19.)

Based on the testimony of the vocational expert, the ALJ found and concluded that Plaintiff was not able to perform her past relevant work, but could perform the jobs of assembler, DOT 706.684-22; machine operator, DOT 208.685-010; and electronics worker, DOT 726.687-010.  (Tr. 20.)  The ALJ "determined that the vocational expert's testimony [wa]s consistent with the information contained in the [DOT]."  Accordingly, the ALJ found that Plaintiff has not been under a disability.  (Tr. 21.)

# VI. ANALYSIS

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Id.* This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it." *Id.* The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a). This standard is

met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience. 42 U.S.C. § 423(d)(2)(A); *accord* 42 U.S.C. § 1382c(a)(3)(B); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a).

Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. §§ 404.1512(a), 416.912(a).

Plaintiff raises three assignments of error. First, Plaintiff asserts that the ALJ erred by failing to consider whether her hearing loss met or equaled listing 2.10. Second, Plaintiff asserts that the ALJ did not provide good reasons for discounting the opinions of Saffert, her treating psychologist. Third, Plaintiff asserts that the ALJ erred in relying on the vocational expert's testimony because it was inconsistent with the DOT. The Court considers each argument in turn.

## A. Hearing Loss & Listing 2.10B

Plaintiff argues that, despite identifying her hearing loss as a severe impairment, the ALJ failed to consider whether her hearing loss met or equaled Listing 2.10 and the

failure to consider whether a severe impairment meets or equals a listed impairment at step 3 warrants remand. (Pl.'s Mem. in Supp. at 4, 7, ECF No. 14.) Plaintiff additionally argues that "the evidence strongly suggests that the severity of [her] hearing impairment was at least 'medically equivalent' to the requirements of Listing 2.10B." (Pl.'s Mem. in Supp. at 4.) The Commissioner responds that Plaintiff has not met her burden to show that her hearing loss is equivalent to Listing 2.10B and the ALJ properly accounted for Plaintiff's hearing impairment when assessing her residual functional capacity. (Comm'r's Mem. in Supp. at 4-8, ECF No. 16.)

"The determination of whether a claimant meets or equals an impairment described in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, is made at step three of the disability determination process." *Carlson v. Astrue*, 604 F.3d 589, 592 (8th Cir. 2010) (citing 20 C.F.R. § 416.920(a)(4)(iii)); *accord* 20 C.F.R. § 404.1520(a)(4)(iii). "During this step, the ALJ has the responsibility to decide whether 'medical equivalence' has been established." *Carlson*, 604 F.3d at 592 (citing 20 C.F.R. § 416.926(e)); *accord* 20 C.F.R. § 404.1526(e). But the failure to explain why an impairment does not equal a listed impairment does not, as Plaintiff contends, *necessitate* remand. *See Boettcher*, 652 F.3d at 863. "There is no error when an ALJ fails to explain why an impairment does not equal one of the listed impairments as long as the overall conclusion is supported by the record." *Id.*; *see Brown v. Colvin*, 825 F.3d 936, 940 (8th Cir. 2016) ("The ALJ's failure to identify and analyze the appropriate listing, although error, may not by itself require reversal so long as the record otherwise support's the ALJ's overall conclusion."). Next, the Court turns to the issue of equivalency.

"An impairment is medically equivalent under the regulations if it is 'at least equal in severity and duration to the criteria of any listed impairment.'" *Carlson*, 604 F.3d at 592 (quoting 20 C.F.R. § 416.926(a)); *accord* 20 C.F.R. § 404.1526(a). "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing. 'An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify.'" *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011) (alteration in original) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). "To establish equivalency, a claimant 'must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment.'" *Carlson*, 604 F.3d at 594 (quoting *Sullivan*, 493 U.S. at 531). Stated differently, equivalency must be based on medical findings. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004); *see* 20 C.F.R. § 404.1526(b)(1) (equivalence established when related findings are "at least of equal medical significance to the required criteria"); 20 C.F.R. § 416.926(b)(1) (same).

Listing 2.10 addresses hearing loss not treated with cochlear implantation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 2.10. Listing 2.10 can be met when either the A or the B criteria are satisfied. *See id.* Plaintiff's arguments concern the B criteria. The B criteria requires "[a] word recognition score of 40 percent or less in the better ear determined using a standardized list of phonetically balanced monosyllabic words." *Id.* § 2.10B. There is no dispute that audiometric testing conducted in April 2013 showed that Plaintiff had a speech discrimination score of 44% on the right and 32% on the left. (Tr. 501; *see* Pl.'s Mem. in Supp. at 6; Comm'r's Mem. in Supp. at 5.)

Plaintiff's word recognition score in her better ear (the right ear) was 44% and thus exceeded Listing 2.10B's 40-percent-or-less threshold.

Plaintiff argues that the results of her audiometric testing combined with her own reports of functional impairment (such as being unable to hear in groups or noisy areas, having difficulty on the phone, and experiencing difficulty discerning words and letters); the need to have questions repeated at the hearing before the ALJ; observations from treatment providers that she has "an 'obvious' hearing impairment"; and Saffert's opinion that Plaintiff's "hearing loss aggravates her symptoms of anxiety" establish equivalence. (Pl.'s Mem. in Supp. at 6-7.)

But, the Commissioner correctly points out that Plaintiff has not identified other *medical findings* related to her hearing impairment that are at least of equal medical significance to Listing 2.10B's criteria, namely, a word recognition score of 40 percent or less in the better ear. (Comm'r's Mem. in Supp. at 6.) As observed by a magistrate judge in the Northern District of Iowa, "[t]here are few reported decisions discussing the Listing 2.10, and even fewer addressing the issue of a claimant attempting to show equivalent impairments. Those that exist, however, reinforce the conclusion that a claimant must come forward with medical evidence showing equivalent hearing loss." *Herring v. Colvin*, No. 15-cv-1021-CJW, 2016 WL 3452775, at *5 (N.D. Ia. June 16, 2016) (citing cases).

Nor can Plaintiff rely on the combination of her hearing impairment with her other impairments or the overall functional impact of her hearing impairment to establish equivalency to Listing 2.10B. "A claimant does not establish medical equivalence . . .

'by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment.'" *Donarski v. Colvin*, No. 14-cv-4419 (HB), 2016 WL 6139951, at *7 (D. Minn. Feb. 2, 2016) (quoting *Sullivan*, 493 U.S. at 531-32); *accord Erstad v. Colvin*, No. Civ. 14-5052-JLV, 2015 WL 5707126, at *6 (D. S.D. Sept. 28, 2015). "It is the medical status of the impairment and not the functional consequences which an impairment may impose or not impose, which drives whether the impairment qualifies under Appendix 1." *Erstad*, 2015 WL 5707126, at *7; *see Ricard v. Astrue*, No. 1:09-0008, 2009 WL 5031317, at *7 (M.D. Tenn. Dec. 14, 2009) (improper to "weigh the effects of other, unrelated impairments in considering whether a *nearly* listing-level [hearing] impairment equals the listed criteria").

While Plaintiff is correct that Dr. Grant, the state agency medical consultant, observed that Plaintiff's hearing loss was "close to listing severity," the ALJ was not required to further develop the record regarding equivalence. (Pl.'s Reply at 2-3, ECF No. 17.) "[L]ongstanding policy requires that the judgment of a physician . . . designated by the Commissioner on the issue of equivalence on the evidence before the administrative law judge . . . must be received into the record as expert opinion evidence and given appropriate weight." *Titles II & XVI: Consideration of Admin. Findings of Fact by State Agency Med. & Psychological Consultants & Other Program Physicians & Psychologists at the Admin. Law Judge & Appeals Council Levels of Admin. Review; Medical Equivalence*, SSR 96-6p, 1996 WL 374180, at *3 (S.S.A. July 2, 1996) [hereinafter SSR 96-6p]; *see Carlson*, 604 F.3d at 593. This "obligation to receive an expert opinion on equivalence" can be fulfilled, however, "by a Disability Determination

and Transmittal form or other document that reflects the findings of the consultant and is signed by the consultant." *Carlson*, 604 F.3d at 593 (citing SSR 96-6p, 1996 WL 374180). And, in *Jones ex rel. Morris v. Barnhart*, 315 F.3d 974 (8th Cir. 2003), the Eighth Circuit Court of Appeals

> concluded that an agency physician necessarily gave the requisite opinion on medical equivalence, albeit not explicitly, where the physician stated that an evaluation of residual functional capacity was required. Because no assessment of [residual functional capacity] would have been necessary if the physician had found that the claimant's condition was equivalent to a listed impairment, we reasoned that the physician implicitly rejected a determination of equivalence.

*Carlson*, 604 F.3d at 593 (citing *Jones*, 315 F.3d at 978 n.2).

In the present case, Dr. Grant concluded that a physical residual functional capacity assessment was necessary for Plaintiff and, in fact, explicitly amended the previous physical residual-functional-capacity assessment "to address hearing loss." (Tr. 154; *accord* Tr. 174.) As in *Jones* and *Carlson*, by concluding that a residual-functional-capacity assessment was necessary for Plaintiff, Dr. Grant implied that Plaintiff's hearing impairment did not equal Listing 2.10. *See Carlson*, 604 F.3d at 593. "The ALJ's consideration of Dr. [Grant's] signed [residual-functional-capacity] assessment satisfied the obligation to receive an expert opinion on equivalence." *Id.* Notably, the ALJ incorporated the noise limitations identified by Dr. Grant on account of Plaintiff's hearing impairment when determining Plaintiff's residual functional capacity. *Cf. Ricard*, 2009 WL 5031317, at *8 (ALJ did not explicitly account for claimant's severe

impairment of decreased hearing loss in determining claimant's residual functional capacity).

Lastly, the present case is distinguishable from *Brown*.  In *Brown*, the ALJ failed to consider Listing 2.10 when considering whether the claimant's severe hearing impairment met or equaled a listed impairment.  825 F.3d at 939-40.  Instead, the ALJ considered a listing that was the precursor to Listing 2.10.  *Id.* at 940.  The Eighth Circuit Court of Appeals was unable to determine whether the ALJ's decision that the claimant's hearing loss did not meet or equal a listed impairment was supported by substantial evidence not solely because the ALJ failed to identify and analyze the appropriate listing, but also because there was conflicting medical evidence on the extent of the claimant's hearing loss, which the ALJ did not accurately describe or adequately explain.  *Id.* at 940-41.  The claimant had undergone two hearing tests.  *Id.* at 940.  In the first test, the claimant's score appeared to meet the requirements of Listing 2.10.  *Id.*  In the second test, the claimant's score did not appear to satisfy the requirements of Listing 2.10.  *Id.*  Neither test was deemed to be very reliable.  *Id.*  "The ALJ did not mention, much less resolve, the seemingly inconsistent results obtained from [the claimant's] two hearing tests.  Nor did the ALJ adequately explain why he apparently elected to place greater weight on the results from the [second] hearing test rather than the results from the [first] hearing test."  *Id.*  Here, there is no conflicting medical evidence.  It is undisputed that Plaintiff does not meet Listing 2.10B and she has not come forward with medical evidence showing equivalent hearing loss.

Because Plaintiff has not identified other medical findings related to her hearing impairment that are at least of equal medical significance to Listing 2.10B's criteria, Plaintiff has not established that her hearing impairment is equivalent to Listing 2.10B. *See Sullivan*, 493 U.S. at 531; *Carlson*, 604 F.3d at 594; *see also Herring*, 2016 WL 3452775, at *5 (claimant "failed to carry his burden of coming forward with medical evidence showing that his hearing impairment was equal to or greater than that in Listing 2.10"); *Taylor v. Colvin*, Civil Action No. H-15-718, 2016 WL 3443655, at *6 (S.D. Tex. June 3, 2016) (while ALJ should have considered whether hearing loss met or equaled a listing after identifying hearing loss as severe impairment, failure to do so was harmless error where claimant's hearing loss "did not approach the required level necessary to meet or medically equal Listing 2.10"), *adopting report and recommendation*, 2016 WL 3455384 (S.D. Tex. June 20, 2016).   Therefore, the ALJ's failure to address Listing 2.10 was harmless.

## B. Treating Psychologist Saffert

Plaintiff next challenges the weight given to the opinions of Saffert, her treating psychologist.   The ALJ gave no weight to either of Saffert's opinions because the limitations identified therein were "in excess of the record" and lacked support in the record.   (Tr. 18, 19.)   The ALJ reasoned that these opinions were inconsistent with Saffert's own treatment notes and the treatment notes of other providers, including Dr. Stolpman.   The ALJ also noted that Plaintiff denied having an anxious mood while on medication.

Medical opinions are statements from psychologists about the nature and severity of a claimant's impairments, including any symptoms, diagnosis, and prognosis; what the claimant is still able to do despite the impairments; and any mental restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). Medical opinions are weighed according to a number of factors, including the examining relationship, treatment relationship, opinion's supportability, opinion's consistency with the record as a whole, specialization of the provider, and any other factors tending to support or contradict the opinion. 20 C.F.R. §§ 404.1527(c), 416.927(c).

Saffert is Plaintiff's treating psychologist. A treating source's "opinion is entitled to controlling weight when it is supported by medically acceptable techniques and is not inconsistent with substantial evidence in the record." *Julin v. Colvin*, 826 F.3d 1082, 1088 (8th Cir. 2016); *accord Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014); *see* 20 C.F.R. §§ 404.1502 (identifying claimant's own psychologist as treating source), 416.902 (same). "Yet[, this "controlling weight"] is neither inherent nor automatic and does not obviate the need to evaluate the record as a whole." *Cline*, 771 F.3d at 1103 (citation and quotation omitted); *see Bernard v. Colvin*, 774 F.3d 482, 487 (8th Cir. 2014) ("Since the ALJ must evaluate the record as a whole, the opinions of treating physicians do not automatically control."). A treating source's opinion may be discounted or disregarded "where other medical assessments are supported by better or more thorough medical evidence, or where a treating [source] renders inconsistent opinions that undermine the credibility of such opinions." *Cline*, 771 F.3d at 1103 (quotation omitted). When a treating source's opinion is not given controlling weight, the opinion is weighed based on

the several factors identified above. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003).   The ALJ is required to "give good reasons" for the weight assigned to a treating source's opinion.   20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *Cline*, 771 F.3d at 1103.

Plaintiff argues that the ALJ did not give sufficient consideration to the fact that not only was Saffert Plaintiff's treating psychologist, she was also the only mental health specialist that actually examined Plaintiff.   Plaintiff also argues that the ALJ evaluated Saffert's opinions in isolation and did not acknowledge that Saffert's opinions were consistent with the opinion of Dr. Stolpman.   Additionally, Plaintiff argues that the ALJ's determination was based on selective references that do not account for the variability in her symptoms, variability which shows that she is not able to work on a continuing basis.

The Commissioner responds that the ALJ recognized that Saffert was a treating source and the opinions were in her area of specialty, psychology; properly took into account the fact that Saffert had only seen Plaintiff three times when she issued her first opinion; and thoroughly considered the supportability and consistency factors with Saffert's own treatment notes and the record as a whole when evaluating Saffert's opinions.   The Commissioner asserts that while treatment notes did not indicate optimal functioning, the treatment notes documented that Plaintiff had greater functionality than Saffert opined.   The Commissioner additionally asserts that Plaintiff is essentially asking this Court to reweigh the evidence that was before the ALJ.

At the beginning of the ALJ's analysis, the ALJ stated that the opinion evidence was analyzed "in accordance with the requirements of 20 CFR 404.1527 and 416.927 and

SSRs 96-2p, 96-5p, 96-6p and 06-3p," thus acknowledging the appropriate considerations. (Tr. 15.) There is no dispute that the ALJ recognized that Saffert was giving an opinion in her area of expertise, psychology. *See* 20 C.F.R. §§ 404.1527(c)(5) (more weight accorded to opinion of specialist in his or her area of specialty), 416.927(c)(5) (same). But, despite the Commissioner's contention that the ALJ noted that Saffert was a treating source, (Comm'r's Mem. in Supp. at 9), any recognition by the ALJ of Saffert's status as a treating source appears to have been implied. To the extent that the longitudinal relationship between Saffert and Plaintiff was acknowledged, it appears to have been implicit by references to multiple visits. *See* 20 C.F.R. §§ 404.1527(c)(2) (treating sources likely able to provide longitudinal picture of claimant's impairments), 416.927(c)(2) (same). Similarly, acknowledgment of the examining relationship between Saffert and Plaintiff appears to have been implicit in those references as well. *See* 20 C.F.R. §§ 404.1527(c)(1) (greater weight given to opinion of source who has examined claimant), 416.927(c)(1) (same). These three factors favor giving greater weight to Saffert's opinions over the opinions of the state agency psychological consultants because, while all of the opinions come from psychologists in their area of expertise, only Saffert has a longitudinal, treating relationship[7] with Plaintiff and she is the only one who examined Plaintiff.

---

[7] The Court pauses for a moment to note that the ALJ properly took into account the length of that relationship when evaluating Saffert's first opinion, noting that she had only seen Plaintiff a handful of times. *See* 20 C.F.R. §§ 404.1527(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."), 416.927(c)(2)(i) (same).

This leaves the supportability and consistency factors. *See* 20 C.F.R. §§ 404.1527(c)(3) (supportability), (4) (consistency), 416.927(c)(3), (4) (same). As to supportability,

> [t]he more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better explanation a source provides for an opinion, the more weight we will give that opinion. Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.

20 C.F.R. § 404.1527(c)(3); *accord* 20 C.F.R. § 416.927(c)(3). The ALJ found each of Saffert's opinions to be unsupported by Saffert's treating notes, which included Plaintiff's own descriptions of her mood, as well as the observations of other treatment providers.

Saffert opined that Plaintiff had marked to extreme limitations in almost all areas of mental function. Yet, Plaintiff herself concedes that there is evidence in the record showing periods of time in which she is functioning rather well and periods of time in which she experiences symptom exacerbation and decreased functionality. (*See* Pl.'s Mem. in Supp. at 13-15; Pl.'s Reply at 5.) Plaintiff asserts that her variable symptoms and inconsistent ability to function do not comport with an ability to work on a regular and continuing basis. But, while Plaintiff's symptoms varied in intensity and Saffert's treatment notes reflected that Plaintiff was not functioning optimally, Saffert's treatment notes do not reflect the same level of impairment contained in her opinions. For example, on several occasions, Saffert's notes indicate that Plaintiff reported she was

doing "pretty good" and Saffert observed that Plaintiff had a "brighter affect." This Court's function is not to reweigh the evidence, which is essentially what Plaintiff is asking this Court to do. The ALJ properly discounted Saffert's opinions because they were inconsistent with her treatment notes. *See Martise v. Astrue*, 641 F.3d 909, 925 (8th Cir. 2011) (treating source's opinion may be justifiably discounted when inconsistent with source's treatment notes).

Turning to the consistency factor, more weight is generally given to opinions that are consistent with the record as a whole. 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). Plaintiff argues that the ALJ considered Saffert's opinions in isolation and erred by not acknowledging or discussing the consistency between Saffert's opinions and Dr. Stolpman's opinion concerning her inability to work. Notably, the ALJ gave Dr. Stolpman's opinion "no weight" because it was "contradicted by the evidence." (Tr. 18.) Plaintiff does not challenge the weight the ALJ gave to Dr. Stolpman's opinion. Her argument that Saffert's opinions should have been given more weight because they were consistent with an opinion given no weight is unavailing.

Moreover, as just discussed, Plaintiff's symptoms varied in intensity and there were intervals during which she was comparatively better or worse. Notwithstanding this variability, the ALJ properly observed several instances where the evidence in the record was inconsistent with the limitations in mental functioning identified by Saffert. Compared to the symptom variability Plaintiff reported to Saffert and Saffert's observations that, at times, Plaintiff was anxious, tearful, and depressed, Dr. Stolpman's treatment notes show that Plaintiff denied crying spells and feeling worthless after

starting Cymbalta and reported that Cymbalta helped with her depression and anxiety. *See Renstrom v. Astrue*, 680 F.3d 1057, 1066 (8th Cir. 2012) (impairments that can be controlled by treatment or medication cannot be considered disabling). Dr. Stolpman consistently observed that Plaintiff was well groomed; frequently described Plaintiff as having an appropriate affect and demeanor; and often stated Plaintiff was "negative" for psychiatric symptoms. Other treatment providers described Plaintiff's depressive symptoms as mild or moderate. Taken together, there is substantial evidence to support the ALJ's conclusion that the marked to extreme limitations identified by Saffert lacked support in and were inconsistent with the record as a whole.

Recognizing that the state agency consultants did not have the same type of examining relationship with Plaintiff as Saffert did, the ALJ found that their opinions were entitled to more weight based on their "specialized knowledge in assessing mental impairments and resulting limitations within the SSA standard of disability" and the opinions' consistency with the Plaintiff's course of treatment, the observations of her treatment providers, and her daily activities. (Tr. 19.) State agency psychological consultants are highly qualified psychologists "who are also experts in Social Security disability evaluation." 20 C.F.R. § 404.1527(e)(2)(i); *accord* 20 C.F.R. § 416.927(e)(2)(i). The state agency psychological consultants opined that Plaintiff is capable of carrying out short, simple instructions and making simple, work-related decisions in a work environment that is not fast paced or based on production requirements, where job duties do not change frequently and such changes can be easily and adequately explained.

Plaintiff asserts that more than one year passed between the psychological consultants' review of the record and the hearing before the ALJ, and the psychological consultants did not have an opportunity to review her entire record, including Saffert's July 2013 opinion and more recent treatment notes. "Other courts have held it was appropriate for an ALJ to consider a consultant's opinion where a [longer] interval had elapsed between the opinion and the hearing where the ALJ reviewed subsequent medical evidence and found it consistent with the consultant's findings." *Chang v. Berryhill*, No. 15-CV-4496 (ADM/HB), 2017 WL 762006, at *13 (D. Minn. Feb. 6, 2017) (two years between opinion and administrative hearing) (citing cases), *adopting report and recommendation*, 2017 WL 758925 (D. Minn. Feb. 27, 2017). Similarly, "[t]he fact that a state agency medical consultant did not have access to all of the records does not prevent the ALJ from assigning significant weight to the consultant's assessment if the ALJ conducted an independent review of the evidence, which included notes the consultant had not considered." *Vue v. Colvin*, No. 13-cv-357 (ADM/FLN), 2014 WL 754873, at *9 (D. Minn. Feb. 26, 2014) (quotation omitted).

After evaluating the evidence in the record, including treatment notes post-dating the opinions of the state agency psychological consultants, the ALJ properly concluded that their opinions were more consistent with the evidence in the record as a whole than the marked and extreme limitations identified by Saffert while, at the same time, taking into account Plaintiff's reported difficulties with concentration, decreased motivation and energy, fatigue, and indecision caused by the symptoms of her depressive and anxiety disorders as well as her chronic pain. In a similar vein, the ALJ was not required to

supplement the record by recontacting Saffert or obtaining a consultative examination "because no 'crucial issue' in the record required development." *Myers v. Colvin*, 721 F.3d 521, 527 (8th Cir. 2013) (quoting *Goff v. Barnhart*, 421 F.3d 785, 791 (8th Cir. 2005)).

It bears repeating that an ALJ's decision will not be reversed simply because some evidence in the record supports a conclusion different from the one reached by the ALJ. *Perks*, 687 F.3d at 1091. Based on the foregoing, there is more than enough evidence for a reasonable person to conclude that Plaintiff's mental limitations were not as extreme as Saffert opined. Even though the examining, treating, specialization factors weigh in favor of according more weight to Saffert's opinions, the ALJ was still required to consider Saffert's opinions in the context of the record as a whole. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4); *Cline*, 771 F.3d at 1103; *Halverson*, 600 F.3d at 929-30. The ALJ gave good reasons for discounting Saffert's opinions and the ALJ's decision to give no weight to Saffert's opinions is supported by substantial evidence in the record as a whole.

### C. Vocational Expert

Plaintiff's final assertions of error concern the ALJ's reliance on the testimony of the vocational expert. Plaintiff argues that the vocational expert's testimony conflicted with the DOT and exceeded Plaintiff's residual functional capacity as determined by the ALJ. In making disability determinations, the Social Security Administration relies "primarily on the DOT (including its companion publication, the [Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles

("SCO")]) for information about the requirements of work in the national economy."

*Titles II and XVI: Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions*, SSR 00-4p, 2000 WL 1898704, at *2 (Soc. Sec. Admin. Dec. 4, 2000) [hereinafter SSR 00-4p]; *see* 20 C.F.R. §§ 404.1566(d), 416.966(d).   When determining whether a claimant is disabled, the ALJ may use a vocational expert to assist with whether a claimant's work skills can be used in other work and the specific occupations in which they can be used.   20 C.F.R. §§ 404.1566(e), 416.966(e).

Occupational evidence provided by a vocational expert

> generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between [vocational expert] evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the [vocational expert] evidence to support a determination or decision about whether the claimant is disabled.

SSR 00-4p, 2000 WL 1898704, at *2.   "[T]he ALJ has an affirmative responsibility to ask about any possible conflict between [vocational expert] evidence and the DOT, and its companion publication (the SCO), on the requirements of a job or occupation before relying on [vocational expert] evidence to support a determination of not disabled." *Kemp ex rel. Kemp v. Colvin*, 743 F.3d 630, 633 (8th Cir. 2014) (quotation and footnote omitted).

> If there is an "apparent unresolved conflict" between [vocational expert] testimony and the DOT, the ALJ must "elicit a reasonable explanation for the conflict" and "resolve the conflict by determining if the explanation given [by the expert] provides a basis for relying on the [vocational expert]

> testimony rather than on the DOT information." The ALJ is not absolved of this duty merely because the [vocational expert] responds "yes" when asked if her testimony is consistent with the DOT.

*Moore v. Colvin*, 769 F.3d 987, 989-90 (8th Cir. 2014) (quoting SSR 00-4p, 2000 WL 1898704, at *2-4). Absent adequate rebuttal, vocational expert "testimony that conflicts with the DOT 'does not constitute substantial evidence upon which the Commissioner may rely to meet the burden of proving the existence of other jobs in the economy a claimant can perform.'" *Id.* at 990 (quoting *Kemp*, 743 F.3d at 632).

The ALJ asked the vocational expert about jobs available to a hypothetical individual of Plaintiff's age, education, and work experience who, among other things, was limited to simple, routine, one-to-two step tasks in a work environment that is not fast paced, such as an assembly line where the pace is set by someone else and there is a strict production quota, and which has infrequent changes that can be easily explained. In response to this hypothetical, the vocational expert identified the jobs of small-products assembler, DOT 406.684-022; collator operator, DOT 208.685-010; and electronics worker, DOT 726.687-010. The vocational expert confirmed that his testimony was consistent with the DOT.

### 1. Assembly-Line Work Environment

Plaintiff argues that, according to the DOT, the jobs of small-products assembler and collator operator are inconsistent with the limitation that she work in an "environment that is not fast paced such as an assembly line where a pace is set by someone else or there is a strict production quota." (Tr. 15.) The Commissioner appears

to concede that the job of small-products assembler is inconsistent with the ALJ's residual-functional-capacity finding.   (Comm'r's Mem. in Supp. at 20.)   While, acknowledging that the job of small-products assembler "is done on an assembly line," the Commissioner asserts that "even if this job were inconsistent with the ALJ's residual functional capacity finding, the other two jobs are not."   (Comm'r's Mem. in Supp. at 20.)

A small-products assembler performs "repetitive tasks on [an] assembly line to mass produce small products."  DOT § 706.684-022, *available at* http://www.oalj.dol.gov /PUBLIC/DOT/REFERENCES/DOT07A.HTM.   This job is in direct conflict with the ALJ's hypothetical and there was no explanation resolving the conflict between the vocational expert's testimony that a person limited to not working on assembly lines could perform the job of small-products assembler, which, according to the DOT, is performed on an assembly line.   But, "one mistaken recommendation does not devalue the rest of the [vocational expert's] opinion." *Grable v. Colvin*, 770 F.3d 1196, 1202 (8th Cir. 2014).   "An ALJ may rely on a vocational expert's testimony as long as some of the identified jobs satisfy the claimant's residual functional capacity." *Id.*  Accordingly, the Court turns to Plaintiff's arguments with respect to the job of collator operator.

Plaintiff asserts that, "[a]lthough the job of collator operator . . . is not performed on an assembly line, it entails tending a machine that assembles pages of printed material and is thus almost certainly performed at a fast pace."  (Pl.'s Mem. in Supp. at 21.)  The Commissioner responds that the job of collator operator "specifically allows the worker to start and adjust machine controls, so the pace is set by the worker and not someone

else." (Comm'r's Mem. in Supp. at 20.) The Commissioner further contends that Plaintiff's speculation that this job is performed at a fast pace is not evidence. (Comm'r's Mem. in Supp. at 20.)

According to the DOT, the definition of a collator operator is as follows: "Tends machine that assembles pages of printed material in numerical sequence: Adjusts control that regulates stroke of paper pusher, according to size of paper. Places pages to be assembled in holding trays. Starts machine. Removes assembled pages from machine." DOT § 208.685-010, *available at* http://www.oalj.dol.gov/PUBLIC/DOT/ REFERENCES/DOT02A.HTM. There is nothing in the definition that indicates this job is performed in a fast-paced, assembly-line-type environment and Plaintiff has offered pure speculation that this job is inconsistent with the pace limitation identified by the ALJ.

## 2.  Simple, Routine, One-to-Two-Step Tasks

Plaintiff also argues that all of the jobs identified by the vocational expert exceed the limitation in Plaintiff's residual functional capacity for "simple, routine, 1-2 step tasks." (Tr. 15.) Plaintiff argues that each job requires more than two steps to perform and the jobs' reasoning-development level of two is inconsistent with a limitation to performing one-to-two-step tasks. In light of the Commissioner's concession that the job of small-products assembler exceeded the ALJ's hypothetical and consequently Plaintiff's residual functional capacity, the Court considers Plaintiff's arguments with respect to the two remaining jobs, collator operator and electronics worker.

Counting each potential job duty in the DOT description as a step, Plaintiff argues that the jobs identified by the vocational expert consist of more than one-to-two-step tasks. For example, using the description of collator operator stated above, Plaintiff contends that this job requires at least four steps to perform. (Pl.'s Mem. in Supp. at 21.) Applying similar logic to the job of electronics worker, Plaintiff contends that this job requires at least 21 steps. (Pl.'s Mem. in Supp. at 21-22). *See* DOT § 726.687-010 (electronics worker), *available at* http://www.oalj.dol.gov/PUBLIC/DOT/ REFERENCES/DOT07C.HTM. But, as this Court has previously stated, the DOT does not equate the duties identified in the job description with steps. *See Manchack v. Colvin*, No. 15-cv-1537 (TNL) (Order at 56-59, ECF No. 17) (D. Minn. Aug. 5, 2016); *see also Oswald v. Colvin*, No. 15-cv-4289 (BRT), 2017 WL 631548, at *5 (D. Minn. Feb. 15, 2017); *Perez v. Colvin*, No. 14-cv-3206 (TNL) (Order at 56-57, ECF No. 22) (D. Minn. Feb. 26, 2016).

Turning to Plaintiff's remaining argument, the DOT classifies the jobs of collator operator and electronics worker both at a reasoning-development level of two. DOT §§ 208.685-010, 726.687-010. Reasoning development at this level requires "[a]pply[ing] commonsense understanding to carry out detailed but uninvolved written or oral instructions" and "[d]eal[ing] with problems involving a few concrete variables in or from standardized situations." DOT app. C, *available at* http://www.oalj.dol.gov/ PUBLIC/DOT/REFERENCES/DOTAPPC.HTM. Plaintiff argues, however, that the ALJ's limitation to "simple, routine, 1-2 step tasks" is more consistent with a reasoning-development level of one, which requires "[a]pply[ing] commonsense understanding to

carry out simple one- or two-step instructions" and "[d]eal[ing] with standardized situations with occasional or no variables in or from these situations encountered on the job." *Id.*   The Commissioner responds that "[a]n 'instruction' is not a 'task'" and "Plaintiff cannot reasonably equate 'performing simple routine 1-2 step tasks' with either 'simple one- or two-step instructions,' or 'detailed but uninvolved' instructions." (Comm'r's Mem. in Supp. at 22.)   The Commissioner also contends that because the Eighth Circuit Court of Appeals has held that unskilled work can include a reasoning-development level of three, it follows that unskilled work can include a reasoning-development level of 2.

Here, the ALJ limited Plaintiff to performing "simple, routine, 1-2 step tasks." (Tr. 15.)   As recently observed by a district court in the Eastern District of Arkansas, the Eighth Circuit Court of Appeals "has not reached the precise issue of how limiting 'simple 1- to 2-step tasks' are." *Thomas v. Colvin*, 3:16-CV-00030 BD, 2016 WL 7191632, at *9 (E.D. Ark. Dec. 12, 2016), *appeal filed*, No. 16-4559 (8th Cir. Dec. 29, 2016).   "Law from this circuit discusses 'simple, concrete instructions' and 'simple repetitive tasks,' but not 'simple 1 to 2 step tasks.'" *Id.* at *8-9 (discussing cases); *see Moore*, 623 F.3d at 604 (finding "no direct conflict between 'carrying out simple job instructions' for 'simple, routine and repetitive work activity' and level two reasoning development); *Manchack*, (Order at 56) (vocational expert's identification of jobs requiring reasoning-development level of two did not exceed limitation to simple, repetitive tasks and was not inconsistent with DOT); *Gustafson v. Astrue*, No. 10-cv-4962 (DSD/LIB), 2011 WL 6219641, at *7 (D. Minn. Nov. 29, 2011) ("Numerous other courts

have concluded that a[ residual functional capacity] allowing a party to perform simple, routine, and repetitive tasks does not prohibit the performance of jobs requiring a reasoning level of two.") (citing cases), *adopting report and recommendation*, 2011 WL 6218211 (D. Minn. Dec. 14, 2011); *Russell v. Astrue*, 626 F. Supp. 2d 921, 947 (D. Minn. 2009) ("The ALJ's limitation for the Plaintiff, as to an appropriate reasoning level, was that he could perform simple, unskilled, entry-level work. Therefore, the DOT's level of two reasoning requirement did not conflict with the ALJ's prescribed limitation.") (citation omitted).

The Ninth Circuit Court of Appeals, however, has addressed this issue. The Ninth Circuit has held that there is an apparent conflict between a residual functional capacity that limits a claimant to performing one- and two-step tasks and a reasoning-development level of two. *Rounds v. Comm'r Social Sec. Admin.*, 807 F.3d 996, 1003 (9th Cir. 2015); *cf. Thomas*, 2016 WL 7191632, at *9 (citing "various district courts in the Ninth Circuit"). The appellate court reasoned that this conflict "is brought into relief by the close similarity" between a residual functional capacity containing a limitation of performing one- and two-step tasks and reasoning-development level one's requirement that "a person . . . apply commonsense understanding to carry out simple one- or two-step instructions." *Rounds*, 807 F.3d at 1003 (quotation omitted). The Ninth Circuit rejected the Commissioner's argument "that 'task' and 'instruction' are different terms." *Id.* The Ninth Circuit held that "[o]nly tasks with more than one or two steps would require 'detailed' instructions. And these are precisely the kinds of tasks [the claimant's residual functional capacity] indicates that she cannot perform." *Id.* Accordingly, because neither

the ALJ nor the vocational expert addressed the apparent conflict, the matter was remanded for the ALJ to determine whether there is a reasonable explanation for the conflict between the vocational expert's testimony and the DOT so as to justify relying on the vocational expert's testimony that there were other jobs the claimant could perform. *Id.* at 1004.

In doing so, the Ninth Circuit observed that "the ALJ did not merely restrict [the claimant] to 'simple' or 'repetitive' tasks," but "expressly limited [the claimant] to 'one to two step tasks.'" *Id.* The Ninth Circuit distinguished this express limitation from cases involving "simple" or "repetitive" tasks, including *Moore*. *Id.* at n.6. The Ninth Circuit explained that cases concluding that a residual-functional-capacity limitation to "simple" or "repetitive" tasks was consistent with a reasoning-development level of two were "inapposite because they did not consider a *specific* limitation to 'one to two step tasks.'" *Id.* (emphasis added).

Here, the ALJ placed additional imitations on Plaintiff's residual functional capacity to perform a full range of light work. The ALJ did not merely restrict Plaintiff to performing more generic and arguably less restrictive "simple," "routine," or "repetitive" tasks, but specifically limited her to "performing simple, routine, *1-2 step tasks*." (Tr. 15 (emphasis added).) *Cf. Moore*, 623 F.3d at 604 ("In the hypothetical, the ALJ did not limit 'simple' job instructions to '*simple one- or two-step* instructions or otherwise indicate that Moore could perform only occupations at a DOT Level 1 reasoning level."). Further, the ALJ limited Plaintiff to a work environment "with infrequent work place changes that can be easily explained." (Tr. 15.) These limitations

are more consistent with reasoning-development level of one rather than two. *See Kibler v. Colvin*, No. 3:15CV00169-BD, 2016 WL 48149, at *2 (E.D. Ark. Jan. 4, 2016) ("The ALJ clearly found that Mr. Kibler was limited to jobs that could be performed in one-to-two step tasks that would be learned and performed by rote with few variables and little judgment. This description best describes level 1 reasoning."); *Brewer v. Colvin*, No. 3:15CV00049 PSH, 2015 WL 5074483, at *3 (E.D. Ark. Aug. 27, 2015) (same); *see also Henderson v. Colvin*, 643 F. App'x 273, 276-77 (4th Cir. 2016) (per curiam) (residual functional capacity limiting claimant to "performing simple one-to-two step tasks with low stress" created apparent conflict with jobs requiring a reasoning-development level of two because the limitation "to one-to-two step instructions" conflicted with reasoning-development level two's "ability to understand detailed instructions").

The Commissioner's argument regarding the specific-vocational-preparation ("SVP") level of the jobs identified by the vocational expert misses the mark. The jobs of collator operator and electronics worker both have an SVP level of 2. DOT §§ 208.685-010, 726.687-010. A job's SVP level is "the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT app. C. An SVP level of 2 equates with a training time of "[a]nything beyond short demonstration up to and including 1 month." *Id.* Jobs with an SVP level of 2 are considered to be unskilled work, meaning "work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 404.1568(a); *accord* 20 C.F.R. § 416.968(a); SSR 00-4p, 2000 WL 1898704, at *3.

The Commissioner's argument—because unskilled work can include a reasoning-development level of three, it therefore follows that unskilled work can include a reasoning-development level of two—does not respond to Plaintiff's argument that the reasoning-development level of the jobs identified by the vocational expert exceeds her residual functional capacity.

The ALJ asked the vocational expert about jobs available to a hypothetical individual of Plaintiff's age, education, and work experience who, among other things, was limited to "simple, routine, 1-2 step tasks, in a work environment . . . with infrequent work place changes that can be easily explained." (Tr. 15.) The limitations identified in the ALJ's hypothetical are most consistent with the requirements of reasoning-development level one, namely, applying a commonsense understanding to carry out simple one- or two-step instructions and dealing with standardized situations with occasional or no variables. The jobs identified by the vocational expert all had a reasoning-development level of two, thereby exceeding the hypothetical and Plaintiff's residual functional capacity as determined by the ALJ. The vocational expert's testimony that a person with limitations of a reasoning-development level of one could perform jobs identified in the DOT as having a reasoning-development level of two created a possible conflict. Because the conflict between the vocational expert's testimony and the DOT was not resolved, the ALJ erred by relying on the vocational expert's testimony at step five and the ALJ's decision that there were other jobs available that Plaintiff could perform is not supported by substantial evidence. *Moore*, 769 F.3d at 989-90; *accord Hillier v. Soc. Sec. Admin.*, 486 F.3d 359, 366 (8th Cir. 2007) ("An ALJ cannot rely on

expert testimony that conflicts with the job classifications in the Dictionary of Occupational Titles unless there is evidence in the record to rebut those classifications.") (quotation omitted).

On remand, the ALJ must determine whether there is a reasonable explanation for the conflict between the vocational expert's testimony and the DOT.  Because the "DOT definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range," and "not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT," this conflict may be explained by testimony showing that the jobs of collator operator and electronics worker are of the type that Plaintiff could perform.  *Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000) (quotation omitted); *see Russell*, 626 F. Supp. 2d at 945; *see also* SSR 00-4p, 2000 WL 1898704, at *2 (reasonable explanations for conflicts with the DOT can include evidence from the vocational expert regarding information not listed in the DOT, including information that may be available from other reliable publications, employers, or the vocational expert's experience in job placement or career counseling). Alternatively, the vocational expert may be able to identify other jobs requiring a reasoning-development level of one and that are otherwise suitable for a person with Plaintiff's limitations.

# VII. ORDER

Based on the foregoing, and all the records, memoranda, and proceedings herein,

**IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for summary judgment (ECF No. 13) is **GRANTED IN PART** and **DENIED IN PART**.

2. The Commissioner's motion for summary judgment (ECF No. 15) is **GRANTED IN PART** and **DENIED IN PART**.

3. The Commissioner's decision is **AFFIRMED** as to steps one through four and **VACATED** as to step five.

4. This matter is **REMANDED** to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Date: March__29___, 2017

          *s/ Tony N. Leung*
Tony N. Leung
United States Magistrate Judge
for the District of Minnesota

*Lilja v. Berryhill*
Case No. 16-cv-540 (TNL)